COLORADO TITLE & TRUST CO. v. CHILDERS et al. *

(Circuit Court of Appeals, Fifth Circuit. February 17, 1919.)

No. 3299.

PRINCIPAL AND AGENT ⊜⟹123(10)—AGENCY OF PAYEE OF NOTE TO COLLECT FOR INDORSEE—EVIDENCE.

Evidence, consisting of course of dealing and correspondence, *held* to authorize finding that payee of notes, secured on cattle, engaged in making loans on such paper and selling the same, with guaranty, was recognized as agent for collection thereof by buyer and indorsee of some of the notes, thus relieving the maker so paying from further liability, and this though notes were in possession of buyer.

Walker, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern District of Texas; Edward R. Meek, Judge.

Action by the Colorado Title & Trust Company against J. G. Childers, Jr., and others. Judgment was adverse to plaintiff, and it brings error. Affirmed.

Geo. Thompson and J. H. Barwise, Jr., both of Ft. Worth, Tex. (George M. Irwin, of Colorado Springs, Colo., and Thompson, Barwise, Wharton & Hiner, of Ft. Worth, Tex., on the brief), for plaintiff in error.

Morgan Bryan and B. B. Stone, both of Ft. Worth, Tex., and A. L. Curtis, of Belton, Tex. (Thos. C. Hall, of Temple, Tex., and A. L. Curtis, of Belton, Tex., on the brief), for defendants in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

BATTS, Circuit Judge. Notes of J. G. Childers to the Ft. Worth Savings Bank & Trust Company were sold by the payee to the Colorado Title & Trust Company, of Colorado Springs, Colo. The notes

---

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 249 U. S. —, 39 Sup. Ct. 494, 63 L. Ed. —.

were given as the purchase price of, and were secured by a mortgage to the Ft. Worth bank on, cattle in the pasture of Childers in La Salle county, Tex. Upon maturity of the notes, the cattle were shipped to St. Louis, sold by a commission house there, and the proceeds remitted to the Ft. Worth Savings Bank & Trust Company. The amount was not remitted to the Colorado bank. The Ft. Worth Savings Bank & Trust Company became insolvent and a receiver was appointed. The Colorado bank instituted suit on the notes against Childers and the Ft. Worth Savings Bank & Trust Company and its receiver. The remittances to the Ft. Worth Savings Bank & Trust Company not being quite sufficient to cover the notes, Childers paid the balance to the Colorado Bank.

Answering the suit, Childers tendered the issue that the Ft. Worth Savings Bank & Trust Company was agent for the Colorado bank in the collection of the notes. He prayed, in case this defense was not established, for judgment against the Ft. Worth Savings Bank & Trust Company, to whom the payment had been made, and against the Ft. Worth National Bank, to which the proceeds of the sale of his cattle had been delivered by the Ft. Worth Savings Bank & Trust Company.

The appeal must be disposed of on a determination of whether the court properly overruled the motion of the plaintiff for an instructed verdict against Childers.

Childers was a cattle raiser, living in La Salle county, Tex., some 400 miles from Ft. Worth. He executed what is commonly spoken of as "cattle paper"; that is, promissory notes, secured by chattel mortgage upon cattle being prepared for market. When the notes were sold to the Colorado bank, the character of the security was indicated by the correspondence. So far as appears, the mortgage was retained by the Ft. Worth bank. After the sale an instrument was executed by the Ft. Worth bank, by which it undertook—

"to guarantee payment of any and all notes now held, or which may hereafter be held, by the Colorado Title & Trust Company, of Colorado Springs, Colo., which bear our indorsement, together with all interest that may accrue thereon; and we also waive presentment and demand of payment of the maker, and we also waive protest and notice to us of protest of any and all such notes for nonpayment."

On June 10, 1915, the Colorado bank wrote to the Ft. Worth bank:

"We hold two promissory notes of J. G. Childers, Jr., both falling due on the 21st inst., one being for $7,734, and the other for $1,634. We wish to advise you in good time that we do not expect to be in the market this month for any cattle paper, and we hope that it will be convenient for you to take these notes up promptly."

To this the Ft. Work bank replied:

"Answering your letter, will say we have notified Mr. Childers that we will expect his paper paid. We may not be able to get the money to you the day the paper is due, but it will be there either at maturity or immediately thereafter."

On July 4th the Colorado bank wrote:

"We expected ere this to receive remittance for two notes of J. G. Childers, Jr., for $7,734 and $1,634, respectively, both due June 21st. By your last

letter you led us to believe that the remittance to cover would have reached us long ere this. We await your prompt reply."

## The Ft. Worth bank replied:

"Regarding the J. G. Childers Jr., paper, beg to advise that Mr. Childers is now shipping his cattle, and as soon as they have been sold on the market the money will be forthcoming to retire his paper which you hold. We are very sorry this matter has dragged along for so much past the maturity of the paper, but we assure you we are doing everything we can to get this money to you as promptly as possible."

## On June 5th the Ft. Worth Bank wrote Childers:

"Your two notes, aggregating $9,368, mature with us on the 21st of this month. We will very much appreciate it if you will make your arrangements to retire these notes at their maturity, as we are using every effort to liquidate our paper as it matures. Please let us hear from you in regard to this paper."

## On the 24th of the month that bank wired Childers:

"When do you expect to ship cattle to take up your paper due 21st? Answer."

## On the same day the Ft. Worth bank wrote Childers:

"We wired you at Cotulla to-day to know when you expected to ship your cattle to take up your paper due the 21st of this month. We received a service on our message, stating that you were en route from Denver and expected next week. We think, Mr. Childers, if you are going to let this paper run past due, you should have advised us about it, so that we might have known what to expect. Please advise us on receipt of this letter when we may expect payment of these notes."

## On July 5th Childers wrote the bank:

"I have just returned from Mexico, and did not receive your message, and received your letter last night. I shipped five cars of steers to St. Louis and will have proceeds sent to your bank to be credited on my account, or rather my note that is past due. I will ship again at once, and will take up my indebtedness with next shipment. I am sorry that this delay occurred."

## On the 12th of the month the bank wrote Childers:

"We are this morning in receipt of three remittances from Cassidy Southwestern, St. Louis, for your account, aggregating $5,485.81, to apply on your note due June 25th for $9,368."

Evidence was introduced showing that the Colorado bank had been engaged in the business of purchasing and collecting cattle paper for a number of years; that it had had various transactions of this kind with the Ft. Worth bank; that it knew that the makers of the notes did not appear in person at the bank to pay them; that it knew that it was customary for the owner of the cattle giving the notes secured by chattel mortgage to ship the mortgaged cattle to market at St. Louis, Kansas City, or Chicago, and that the owner did not, ordinarily, accompany the shipment; that instructions would be given to the commission house selling to remit the proceeds to the mortgagee; that the course of dealing between the Colorado bank and the Ft. Worth bank was, with reference to notes purchased from the latter, for the Ft. Worth bank to collect the money, "the transaction being, in a general way, similar to the Childers transaction with ref-

erence to the sale of the cattle, and the proceeds being sent to the Ft. Worth bank as the cattle were sold"; that the Colorado bank had never objected to this course of conduct on the part of the Ft. Worth bank; that, according to the ordinary course of dealing, they expected the Ft. Worth bank to collect the money from the maker, as in this case. At the time the Colorado bank wrote its first letter to the Ft. Worth bank with reference to the collection of these notes, the Colorado bank had not notified Childers that it had become the owner of his notes, and the Colorado bank knew that it was not customary for the bank taking cattle paper to notify the maker when sale of the paper was made.

The Colorado bank was informed by the Ft. Worth bank that it had notified Childers "that we will expect his paper paid." Later the Ft. Worth bank wrote the Colorado bank that—

"Childers is now shipping his cattle, and that as soon as the cattle have been sold on the market, the money will be forthcoming to retire his paper which you hold."

In this letter the Colorado bank was assured that the Ft. Worth bank was "doing everything we can to get this money to you as promptly as possible."

The Colorado bank, although it assumed that the maker of the notes had no notice of their transfer, acquiesced in the action of the Ft. Worth bank in informing Childers that it expected the paper paid. The Colorado bank could not have expected the maker of the notes to pay the Ft. Worth bank, except upon the idea that the Ft. Worth bank was authorized to collect the notes for the owner. The only proper basis for the payment by Childers to the Ft. Worth bank was either ownership by the Ft. Worth bank of the notes or agency of the Ft. Worth bank for the collection of the notes. The Colorado bank knew that the notes did not belong to the Ft. Worth bank, and was put on notice, by the letter of June 15th, that the Ft. Worth bank was exacting payment from Childers. The jury was authorized to assume that the Colorado bank recognized or acquiesced in the agency of the Ft. Worth bank, rather than that the Colorado bank was permitting the Ft. Worth bank to make a collection that it had no right to make, and permitting it to appropriate to its own use a fund dedicated to the discharge of the notes and mortgage.

The jury had before it evidence of the ordinary course of business, and evidence that the Colorado bank was entirely familiar with it; that is, the shipment of the cattle to market, and the remitting by the commission concern selling the cattle to the original payee of the notes and the person or bank named as mortgagee in the chattel mortgage.

Again, on July 6th, the Colorado bank was notified that Childers was shipping his cattle to market. This shipment from the county in which the mortgage was registered could not be made without the consent of the holder of the notes and of the mortgage to secure them. Nor could a sale be made without consent. The letter of the Ft. Worth bank to Childers clearly constituted an insistence that the shipment be made and the cattle sold. Later the Colorado bank was

notified that the shipment was being made, and it carried the necessary inference that the matter of shipment (with the resulting sale and remittance) was being looked after by the Ft. Worth bank. Considering the ordinary course of business, the letters of the Ft. Worth bank to the Colorado bank, informing the latter that the former had notified Childers that his paper must be paid, and, later, that he was shipping the cattle to market for the purpose of retiring the paper, would authorize a jury to find that the Ft. Worth bank had assumed to act for the Colorado bank, and the jury was warranted in the conclusion that the Colorado bank had acquiesced in this agency.

It is insisted that the agency to collect could not be assumed, in the absence of possession of the notes by the Ft. Worth bank. Possession by the Ft. Worth bank of the notes belonging to the Colorado bank would be conclusive, in so far as the maker was concerned, of the right of the Ft. Worth bank to collect the notes; but the absence of the notes would not be conclusive of the absence of authority to collect. The circumstances in this case are such that no special significance should be attached to the fact that the notes were not at the Ft. Worth bank. The Colorado bank and the Ft. Worth bank were both familiar with the ordinary course of business, and Childers acted in accordance with this ordinary course. He did exactly what he contracted to do, and exactly what he was expected by both banks to do. It is true that he executed negotiable paper, and thereby knew that his payment might have to be made to a person other than the original payee of the notes. It is on this account that agency of the Ft. Worth bank was essential to his protection, notwithstanding he did exactly what it was assumed he would do at the time he executed the notes.

A consideration of the entire record would authorize the conclusion which the jury reached. It sufficiently appears that, in the ordinary course of business the Ft. Worth bank was making loans to cattlemen. The character of security taken enables the payees, as in this case, to discount the paper with a small profit to themselves. The Colorado bank, acting as other purchasers of this class of paper, made no investigation of the particular loan, but depended upon the general or usual quality of such paper, and especially relied upon the assumed responsibility of the sellers of the paper. It supplemented the ordinary effect of an indorsement of the paper by taking a guaranty of payment of any such paper as might come into its hands from the Ft. Worth bank, and by this contract relieved itself of even the necessity of informing the indorser of the notes when payment was not made at maturity. That which was done in this case, and the ordinary course of business, would indicate that the Colorado bank did not expect to have any character of relation with the maker of the notes, but depended upon the seller. Under these conditions, the seller did those things which the owner of the notes would, in the ordinary course of business, do. With full knowledge of the conditions, and of the effect of that which was being done by the Ft. Worth bank, the Colorado bank completely acquiesced. Agency may

as well be inferred from such fact as from the direct giving of authority.

The jury was warranted in the conclusion reached, and the judgment is affirmed.

WALKER, Circuit Judge (dissenting). The holder of the notes was the creditor of both maker and indorser of them. The correspondence between the holder and the indorser shows that the former was insisting on the latter paying the notes, and that the latter attributed delay in payment to its failure to receive a remittance of the proceeds of the sale of the maker's cattle. There is nothing in the evidence to indicate that the holder consented to such delay, that it authorized or even acquiesced in any dealing between the indorser and the maker, or that it did not continue to look to the indorser and guarantor itself to make payment, as it was obligated to do, without regard to whether it did or did not receive a remittance from or on account of the maker. When a creditor demands payment of one of two debtors, the fact that the one called on for payment makes it known that he expects to get from his codebtor the money with which to satisfy the demand is not enough to make him the creditor's agent for that purpose. The cattle mortgage given by the maker was not mentioned. Its enforcement or foreclosure was not suggested in the correspondence, which shows all that occurred between the holder and indorser of the notes. That correspondence shows that the parties to it were dealing with each other as creditor and debtor, not as principal and agent. It does not seem permissible to give to the single circumstance that the holder of the notes was made aware that the indorser of them was expecting to get the proceeds of the sale of the maker's cattle before complying with its obligation to pay the effect of making the indorser the holder's agent to collect from the maker of the notes the amount due on them, which was equally due from the indorser, of which the holder was demanding payment. In the opinion of the writer, there was no evidence tending to prove that the payee and indorser was the agent of the holder of the notes, and, as such, received the proceeds of the sale of the maker's cattle.