[Civ. No. 2269.   Third Appellate District.—February 23, 1921.]

# W. C. RAMSEY, Appellant, v. CALIFORNIA PACKING CORPORATION et al., Respondents.

[1] CHATTEL MORTGAGE—EXECUTION BEFORE NOTARY PUBLIC—INTERESTED PARTY—INVALIDITY AS TO THIRD PARTIES.—A mortgage on a growing crop executed before a notary public who is a part owner of the note and mortgage is illegal and void as to third persons, and its recordation does not impart constructive notice to a purchaser of the crop from the mortgagor after its removal from the land. (Opinion of supreme court withheld on denial of hearing.)

[2] ID. — REMOVAL AND SALE OF MORTGAGED CHATTELS — ACTION FOR DAMAGES—NONSUIT — SUFFICIENCY OF EVIDENCE. — In 'this action for damages for the alleged tortious removal of mortgaged chattels and the wrongful conversion of the property, a nonsuit was properly granted on the ground that it appeared from the evidence that it was the understanding of the parties that the chattels were to be removed and sold and the proceeds applied to the mortgage indebtedness.

[3] Id.—Tortious Removal of Mortgaged Crop—Burden of Proof.—Where the lien of a mortgage on a growing crop has been *prima facie* extinguished by the removal of the crop from the land, it rests upon the mortgagee, if he would still enjoy the benefit of his mortgage security, to rebut the presumption by showing that the crop was removed without his knowledge and consent and was therefore a tortious removal.

[4] Id. — Removal and Sale of Mortgaged Crop — Permission to Mortgagors—Effect of.—An agreement allowing mortgagors to sell mortgaged crops and turn over the proceeds of the sale to the mortgagee, amounts in practical effect to a substitution of the personal obligation of the mortgagors for the security of the mortgage.

APPEAL from a judgment of the Superior Court of San Joaquin County. D. M. Young, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. H. Carpenter for Appellant.

Nutter, Hancock & Rutherford and Pillsbury, Madison & Sutro for Respondents.

HART, J.—This is an appeal by plaintiff from a judgment of nonsuit granted at the end of plaintiff's case on the motion of the defendants California Packing Corporation and E. Powers, who interposed their respective answers to the complaint. The defendants Kim and Hahn did not file an answer or answers to the complaint. The appeal is supported by a bill of exceptions.

The facts, in summary, may be stated as follows: Plaintiff was the owner in fee of 320 acres of ranch property which he leased to the defendants Kim and Hahn on the first day of November, 1917, for the term of one year wherein, plaintiff asserts in his brief, there was a stipulation that "the title to the crops shall remain in the party of the first part [plaintiff] until the entire rental is paid and the work performed.". The complaint alleges that on the eighteenth day of March, 1918, the same defendant lessees gave to the plaintiff two promissory notes, one for $3,000 and the other for $2,000, and, to secure the payment thereof, at the same time gave to said plaintiff and owner of said real property a crop or chattel mortgage on all crops of sugar-beets, to-

matoes, beans, Egyptian corn, and similar products "being, standing and growing" on the land described in the mortgage at that time, namely, March 18, 1918, when the chattel mortgage was signed. · The note for the smaller amount was subsequently paid in full by the makers, who, also, before this suit, paid $500 on the other note. At the close of the harvest season of 1918, the answering defendants, California Packing Corporation and E. Powers, purchased and received possession from the said mortgagors (Kim and Hahn) of all the said crops of Egyptian corn and tomatoes and applied the same to their own use. Shortly after such sale and delivery of said crops by Kim and Hahn, the plaintiff demanded the aforesaid crops from said purchasers or enough of the proceeds thereof to satisfy his mortgage claim. The said answering defendants refused to return the crops so sold and delivered as aforesaid, or to pay or satisfy said mortgage note. This action is for damages in the sum of $2,622.50, the said damages being equal to the balance due on said note, for the tortious removal of the mortgaged chattels from the land described in the mortgage and the wrongful conversion of said property. The case was tried by the court without a jury.

The court, upon the close of the plaintiff's case, and on motion of counsel for the answering defendants, struck from the record the lease whereby the premises described in the mortgage were demised to Kim and Hahn. Immediately following the making of that order, the motion of the defendants California Packing Corporation and Powers for a nonsuit was granted upon the following grounds and reasons: "First. That the crop or crops, the value of which plaintiff is suing for, were not crops included in the mortgage. Second. Because the mortgage itself is invalid. The execution of the instrument was before a person who was one-half interested in the proceeds of these crops. Third. The general principle of law of course is that cited in the section, that the crops when severed—the old law was when severed from the soil—the crop mortgage became extinguished, and later the statute went one step further and stated they had to be removed from the premises. In other words, so long as the crops are on the premises of course the mortgage still exists, but when removed, the mortgage becomes extinguished —here are the exceptions—and the plaintiff must show we

are in the excepted class—that the goods were moved tortiously; that there was some act or thing done by the defendant himself that caused that removal. Fourth. The law says there must be some testimony of diligence on the part of the mortgagee of a crop mortgage. He cannot sit by and wait for a season to pass and allow those crops to leave the lands, or to be taken therefrom, and then afterward, when an innocent purchaser buys the property go to the man for the crops or go to the man for the money."

Before taking up for consideration the points involving the merits of this controversy, it is proper that we should first dispose of the suggestion of a diminution of the record on appeal made and filed by the respondent California Packing Corporation. The answer of said respondent denied certain allegations of the complaint on information and belief by specific reference to the numbered lines and pages of the complaint as they were numbered in the original draft of that pleading. Counsel for the plaintiff moved in the court below that so much of the answer as denied the allegations thus referred to "on information and belief" be stricken out on the ground that the matters as to which, by its denials, the Packing Corporation disclaimed knowledge were presumably within its knowledge and should, therefore, have been directly denied. Typical of the allegations thus denied were those relative to the execution of the mortgage and the promissory notes by the nonanswering defendants, Kim and Hahn. It appears, however, that the denials of the answer to said allegations of the complaint on information and belief, while so conforming to the original complaint as it was numbered by page and lines as that no possible misunderstanding could arise as to the particular allegations of the complaint to which such denials were addressed, do not conform to the complaint, as to the paging and the numbering of the lines thereof, as it is printed in the transcript on appeal. The object, therefore, of the suggestion of the diminution of the record was to bring before this court the original complaint, so that this court would be afforded enlightenment upon the point urged by the appellant that the court below erred in refusing to grant his motion to strike from the Packing Corporation's answer the denials referred to. We think the suggestion should be allowed and it is, therefore, the order that the record certified

to this court on the suggestion be and the same is incorporated into the record as a part thereof. Whether the court erred in refusing to strike from the said answer the denials referred to will be considered herein later on.

Upon the merits, we first remark that the ground of the nonsuit first above stated, to wit, that "the crop or crops, the value of which plaintiff is suing for, were not crops included in the mortgage," is, to the mind of the writer of this opinion, not only very technical but of doubtful validity. The argument supporting that position is, in effect, that the language of the mortgage describing the property to which it was intended the lien should attach, being in the present tense, or having reference to crops then (at the time of the execution of the mortgage) growing and standing on the land, and that the crops, the value of which the plaintiff is suing for, not having been planted and not "being or growing or standing" on said land until several months after the mortgage was executed, the crops involved herein are not and could not be held to be affected by the mortgage lien. The judgment, however, must be affirmed for other reasons, as presently we will show, and, therefore, while it is not necessary and we will not attempt to construe the mortgage for the purpose of ascertaining its just scope and effect, we will nevertheless suggest that it is very doubtful (at least in the mind of the writer) whether the language of the mortgage referred to, although in the present tense, is required to be so construed as to compel the conclusion that the mortgage does not include, nor was intended by the parties to cover, any crops of the kind specifically mentioned in the instrument (beans, tomatoes, corn, etc.) whenever seasonably produced upon the land within the year during which the notes and mortgage were to run (year 1918), it being shown and, indeed, a matter of common knowledge, that at the date of the execution of the notes and mortgage it was not the season of the year to plant and grow such crops. That the mortgage was intended and is sufficiently definite to include the crops involved herein would certainly be not only the just but the equitable construction of the mortgage and the view that a court of equity would be strongly inclined to take in such a case before it would deny to the mortgagee the only security he in good faith believed his mortgage afforded him for the pay-

522     Ramsey v. California Packing Corp.     [51 Cal. App.

ment of a just and honest debt, in the event that the case reached that forum by proceedings in foreclosure, as thus it could properly be taken there (Civ. Code, sec. 2967; Code Civ. Proc., secs. 726–729), the remedy by foreclosure being of equitable cognizance, albeit the right to make and to take a chattel mortgage to secure an indebtedness is purely of statutory origin. But, as stated, it is not necessary to decide the question here, and it is to be understood that the suggestions we offer are wholly gratuitous and do not involve a definite or, indeed, any construction of the scope and meaning or intent of the mortgage in the particular mentioned. We will, however, in considering the remaining questions, assume that the mortgage is not susceptible to the construction to which the respondents subject it.

The other three grounds and the reasons upon which the nonsuit was presumptively granted practically involve the same ultimate propositions, viz., whether the crops were tortiously removed from the freehold and sold, and, even if so, whether the respondents were parties to those tortious and unlawful acts. Obviously, if the crops were removed by and with the consent of the plaintiff, then they were not wrongfully or tortiously removed, and in that case the lien of the mortgage ceased upon such removal by operation of law. This proposition follows from the terms of section 2972 of the Civil Code, which reads as follows: "The lien of a mortgage on a growing crop continues on the crop after severance, whether remaining in its original state or converted into another product, so long as the same remains on the land of the mortgagor."

It is in order first to inquire whether, assuming for the purposes only of such inquiry that Kim and Hahn wrongfully removed the crops from the land, the answering defendants knew, before or at the time they purchased the crop, that such removal was tortious, and the first step to that end is to ascertain whether they had either actual knowledge or legal notice of the existence of the mortgage at the times designated. As to actual knowledge, it is to be said that there is no evidence showing or even remotely tending to show that they had any such knowledge of the mortgage, and if, therefore, they are to be charged with any wrong in the transaction culminating in the sale of the tomatoes and corn to them, they can only thus be bound because

there must be imputed to them the notice of the mortgage constructively imparted to them by reason of the recordation of said mortgage as required by law.

[1] The contention of the respondents is, and so the court below expressly held in its decision of the motion for the nonsuit, that the mortgage was not legally recorded and, consequently, did not impart constructive notice of its existence to third parties for the reason, so it is asserted, that the evidence shows that T. F. Emerson, the notary public before whom the instrument was acknowledged, was a partner and joint beneficiary with the plaintiff in the notes and mortgage securing the same at the time of and subsequent to the execution of those instruments.

The law is, as is well understood, that every instrument required to be recorded, with the exception of those belonging to the class mentioned in sections 1159, 1160, 1202, and 1203 of the Civil Code, cannot be recorded unless its execution is acknowledged by the person executing it, "or if executed by a corporation, by its president or secretary, or other person executing the same on behalf of the corporation," etc. (Civ. Code, sec. 1161.) But it is the settled law in this state as well as in other jurisdictions "that an acknowledgment taken before a grantee, or one standing in the position of a beneficiary under a conveyance, or other written instrument, is void, and does not entitle an instrument to be recorded." (*Greve* v. *Echo Oil Co.*, 8 Cal. App. 275, 284, [96 Pac. 904]; *Merced Bank* v. *Rosenthal*, 99 Cal. 39, [31 Pac. 849, 33 Pac. 732]; *Lee* v. *Murphy*, 119 Cal. 364–370, [51 Pac. 549, 955]; *Murray* v. *Tulare Inv. Co.*, 120 Cal. 311, [49 Pac. 563, 52 Pac. 586; *Henrici* v. *South Feather Land etc. Co.*, 177 Cal. 442, 446, [170 Pac. 1135].) While, as between the parties to a mortgage so acknowledged, the mortgage is in full force and of binding efficacy, the record of the instrument does not impart any notice to third persons of the mortgagee's right under it. (*Lee* v. *Murphy*, 119 Cal. 370, [51 Pac. 955], and cases there cited.)

The evidence in this case shows, without conflict, that at the time of the execution of the notes and mortgage, and, in fact, at all times, Emerson was not only a partner of the plaintiff in the real estate business in the city of Stockton but was interested as a partner of and beneficiary with plaintiff in the notes and mortgage in question here. The

plaintiff, testifying on his cross-examination, stated that "T. F. Emerson, the notary public who took the affidavit of W. T. Kim and C. H. Hahn to the crop mortgage pleaded in the complaint, and who also took the acknowledgment of W. T. Kim and C. H. Hahn to the crop mortgage, is the owner of a half interest in the land described in the complaint; that he and Emerson were partners in business; that Emerson owned one-half interest in all the crops that were growing on the premises on the day the mortgage in question was executed; that Emerson's interest in the said crop was similar to his [plaintiff's]—that is, each of them had a like interest in the crops."

Emerson, while denying that he had any interest in the land described in the mortgage, did not deny owning an interest in the crops grown thereon and the notes and mortgage. From his testimony generally, however, the inference appears to be justified, if not irresistible, that he was interested in the crops to the extent of the mortgage lien thereon. It was Emerson who personally prosecuted efforts to secure the payment of the note secured by the mortgage after the tomatoes and corn had become ready for harvesting. He testified that he saw said crops while they were growing; that he saw them after they had been harvested, and that he kept in such touch with the situation as to know that portions of said crops had been severed from the land and sold to the two answering defendants. He talked with Kim and Hahn about the crops and told them that they (plaintiff and himself) desired to secure payment of the note from the sale of said crops; that after he found out that the crop of tomatoes had been sold to the defendant Packing Company he "talked with Mr. Kim about it, and he was to make some payment upon the note for rent—this mortgage note; and I had been after him on that right along, because *we* wanted to get it fixed up. I asked him how soon he could pay something, and he said that he could pay just as soon as they remitted to him—the cannery company." He further testified that, after considerable effort to obtain an interview with Mr. Davis, the local manager at Stockton of the Packing Corporation, after the latter had purchased the tomatoes and before paying for them, he met him (Davis) in the month of October, 1918, when "I told him that Mr. Kim owed *us* some money, and we had been after

Mr. Kim for it, and he, Kim, said that Mr. Davis, or the company, was to pay the money; I said [to Davis], 'How soon will that be?' He said they would all be in in a little bit and it would be fixed, if possible—they were always glad to fix up anything of that kind, and didn't want any trouble about the matter. I said *we* are anxious about it, just as much as you are. . . . Mr. Davis said to me: 'I will take the matter up with the company. I will get in correspondence with them, and you 'will hear from them later.' I did say that we wanted *our money for our goods."* And this was the trend of all of Emerson's testimony, and from it, as stated, it is clearly to be inferred that he was a partner of and joint beneficiary with the plaintiff in the notes and the mortgage in controversy. In view of the fact that there was not a direct or even inferential denial by Emerson of the positive statement of plaintiff that he (Emerson) was interested in the note and mortgage equally with plaintiff, and of the further fact that Emerson at all times in his testimony in effect referred to the indebtedness evidenced by the note described in the mortgage as being due to him and plaintiff jointly, and there being no testimony upon that proposition other than that of plaintiff and Emerson, there is, it is manifest, clear justification for our statement, above made, that the evidence, without conflict, appears to show that plaintiff and Emerson were and are partners and joint beneficiaries in the note and mortgage described in the complaint. Indeed, it seems to us that no other conclusion can follow from the testimony introduced by the plaintiff. It, of course, results that the mortgage was and is as to third parties, illegal and void. And it is to be noted that there is a marked distinction between the case where there are several grantees or mortgagees, each taking or having a separate and defined interest in the grant or mortgage, and the case we have here. In the former it has been held that the deed or mortgage should be treated as if made separately to each of such grantees or mortgagees, and that, therefore, the acknowledgment should be held good to all of them except the party taking it. (*Murray* v. *Tulare Inv. Co.,* 120 Cal. 311, 314, [49 Pac. 563, 52 Pac. 586].) In the present case, as will be observed, the evidence shows that the mortgage was, in fact, though not *eo nomine,* to the plaintiff and the party taking the acknowledgment as copartners—in point of fact,

joint mortgagees. There was no "separate and defined interest" in either of the two parties constituting the partnership for and in behalf of which the acknowledgment was taken. It follows that the mortgage, being void in its effect upon third parties because of the defective acknowledgment, or, in fact, for the reason that in law there was no acknowledgment at all of the execution thereof which would entitle it to be recorded, imparted no notice of its existence to the answering defendants herein by the mere act of its having been recorded. In other words, the act of placing the mortgage of record was without legal force or effect so far as the respondents were concerned, and did not, as to them, operate as constructive notice of its existence. Nor was there any evidence showing that respondents had knowledge of any facts sufficient to put them on inquiry which, if followed up with reasonable diligence, would have discovered to them the existence of the mortgage.

Obviously, if the answering defendants had no actual knowledge or any notice of the existence of the mortgage at the time they purchased the crops in question, they were innocent purchasers and cannot be bound by the acts of Kim and Hahn in removing the crops from the freehold, even if such removal was tortious and unlawful.

[2] But, aside from the above considerations, it is very plain that the nonsuit was properly granted for the reason that the evidence clearly shows that the understanding between the parties was that Kim and Hahn were to remove and sell the crops and with the proceeds pay their mortgage indebtedness to plaintiff and Emerson. From the testimony of Emerson, some of which is referred to in connection with the above consideration of the question of the validity of the acknowledgment of the mortgage, it is clear that he knew, before the removal of the crop, that Kim and Hahn intended to remove and sell the same. Emerson admitted that he knew that certain portions of the crop had been removed from the premises and sold, and that the mortgagors intended to remove and sell the remainder; yet neither the plaintiff nor his partner took any steps to prevent such removal and sale. But there was, evidently, according to Emerson's uncontradicted testimony, no intention on the part of plaintiff and Emerson to object to such removal and sale—that, indeed, the removal and sale of the crops by the mortgagors

they sanctioned—for, having been asked by counsel for the Packing Corporation the following question: "It was your understanding, was it not, throughout this transaction, from Kim, that he should sell the tomatoes?" he replied: "Yes, sir, *and pay the rent to us; that he should have the power to sell them and deliver them to whomsoever he chose.*" He further testified, referring to a conversation he had with Kim at the premises on which the crops were grown, on the twenty-fifth day of October, 1918: "Yes, I had been talking with Kim at that time, and then right along after; Kim said [addressing Emerson] : 'You will get all your money because Egyptian corn is good. . . . There will be plenty of money with the tomatoes and the Egyptian corn to pay for rent.' . . . He assured me that *just as quick as the crops were cut off and sold we would get the money.* That was satisfactory to me." The plaintiff did not contradict that testimony, nor, as stated, is there any testimony in the record contradictory thereto. Indeed, the plaintiff himself testified: "I am familiar with farming in this location, and I know when tomatoes generally ripen and are ready for delivery at Manteca [near which place are situated the premises on which the crops involved herein were grown] ; they commence to ripen along in September and October; I knew they were ripening in those months, but I did not know that they had been sold; I did not know what Kim was doing with them, or where they were being delivered; *I judged that they were, but I could not have told to whom they were delivered or to whom they were sold.*" Every act and movement of Emerson in the transaction seems to corroborate the foregoing testimony. Emerson, as between himself and Ramsey, appeared to be the most active in looking after their interests in the crops and in securing, after the maturity of the crops, a satisfaction of the mortgage debt, and furthermore, after the sale of the tomatoes to the Packing Corporation, it does not appear that he complained to Kim and Hahn for removing and selling the crops. He did not tell them that they had done wrong in doing so, but by his general conduct of quiescence as to such removal and sale, very clearly appeared to have regarded their acts as within the power and the rights of Kim and Hahn. His only concern about the matter then seemed to be as to the payment by the Packing Corporation for the tomatoes, his purpose being

to obtain such payment direct to him and the plaintiff instead of to the mortgagors. Certainly, if the understanding was not such as Emerson positively testified that it was, to wit, that Kim and Hahn were vested with full power to remove the crops from the premises and sell the same and thereupon pay the money to plaintiff and Emerson in extinguishment of the mortgage, the latter were, according to their own testimony, culpably negligent in the matter of the preservation of the integrity of their security. As to the tomatoes, they knew, as everybody knows, that that vegetable is of the perishable kind, requiring immediate preservation very soon after being harvested. Emerson said he visited the premises very often, and, of course, he knew from that fact, if not from his general acquaintance with the seasonal characteristics or peculiarities of the tomato—that is, the time for planting the same and the time when, in the ordinary course of nature, it has so developed as to require that it be harvested—when the time for harvesting was reached, and still, as before declared, he and the plaintiff themselves made no move looking to the disposal of any of the crops. It would thus seem that there was no other course left to Kim and Hahn, if anything was to be realized from said crops, but to dispose of them themselves.

[3] Even if it were necessary to concede here that there was no other showing of an abandonment of the mortgage security by the plaintiff and Emerson but the circumstances to which we last above refer, it is very clear that the judgment of nonsuit would have to stand; for, at the time of the purchase of the tomatoes by the Packing Corporation and the corn by Powers, the lien of the mortgage had *prima facie* been extinguished by the removal of those crops from the land on which they were grown (*Horgan* v. *Zanetta,* 107 Cal. 27, 30, 31, [40 Pac. 22]; *Gates* v. *Tom Quong,* 3 Cal. App. 443, 446, [85 Pac. 662]), and it rested upon the mortgagee, if he would still enjoy the benefit of his mortgage security, to rebut that presumption by showing that the crops were removed without his knowledge and consent and that it was, therefore, a tortious removal. And, as before declared, even if it had been shown that the mortgagors had wrongfully removed the crops and sold the same to a third party, it would still be necessary, to bind the latter in an action for damages for such wrongful removal or for

the conversion of the crops, further to show that such removal was tortiously effected with his knowledge or by connivance on his part with those wrongfully removing the crop to effect such removal. There is not only no such showing here but, to the contrary, as has been stated, even without regard to the positive testimony that Kim was authorized by plaintiff and Emerson to remove and sell the crops, the circumstances of the whole transaction as shown by the testimony of both plaintiff and Emerson very clearly strengthen and sustain the presumption that the crops were removed from the premises and sold by Kim under a specific understanding and agreement with the plaintiff and Emerson that he was thus to dispose of the crops upon their maturity. [4] This agreement (allowing the mortgagors to sell the mortgaged crops and turn over the proceeds of sale to plaintiff and Emerson) amounted in practical effect to a substitution of the personal obligation of the mortgagors for the security of the mortgage. (*Minneapolis Thresh. Machine Co.* v. *Calhoun*, 37 S. D. 542, [159 N. W. 127].)

The authorities cited by the appellant have to do with the cases in which the evidence clearly discloses a tortious removal of the mortgaged crop, and, of course, are not in point here.

The other assignments to which attention will be given involve objections to the action of the court in refusing to strike from the answers certain denials contained therein and heretofore referred to and in striking from the record the lease, previously received in evidence, whereby the premises on which the crops in question were grown were demised to Kim and Hahn by plaintiff.

1. As stated above, when considering the matter of the suggestion of the diminution of the record, the particular denials of the answer to which the motion to strike out was addressed were upon information and belief, and related to those allegations of the complaint which referred to the execution of the notes, the execution of the mortgage, the good faith thereof, the acknowledgment and recordation of the mortgage, that no part of the promissory note described in the mortgage has been paid, except a certain specific amount, and other like averments.

The disallowance of the motion to strike out the denials referred to was proper. The matters in the complaint to

which said denials were addressed involved private trans-actions between private individuals and it is not the law that such matters are presumed to be within the knowl-edge of third persons, unless the same are required by law to be made a public record, or are of such common notoriety that all persons must know of them. As to the mortgage, which, of course, cannot be binding upon third persons unless it is recorded as required by law, we have already shown that, in law, it was not recorded, and, therefore, the answering defendants were not to be charged with construc-tive notice thereof.

2. The lease which was received in evidence and subse-quently stricken from the record was, as seen, from the plaintiff to Kim and Hahn and demised to the latter, for a certain specified consideration, the premises upon which the crops in question were grown. That lease, however, had been modified or changed in vital particulars, and was, consequently, not the lease under which Kim and Hahn were holding the property at the time that the said crops were removed from the premises and sold. But, waiving a consideration of that proposition, we cannot perceive wherein the order of the court striking the lease from the record, even if in any view erroneous, can be held prejudicial. The only purpose the lease could have served as evidence in the case would be to show that Kim and Hahn held possession of the land thereunder as tenants of the plaintiff. If it was important under the issues that this fact should be known, the reply is that the answering defendants conceded at the trial that the land was held by Kim and Hahn under a lease from plaintiff. But it seems to us that whether Kim and Hahn held possession of the land as tenants of the plaintiff or held such possession as tenants of some other person or themselves were the owners of the land is wholly without significance here if, as is conceded by all parties hereto be true, and which is the theory upon which the complaint was framed and the issues were joined and tried, they owned the crops which are referred to in the mort-gage. The question whether the mortgagors of the crops held possession of the land could have no bearing on the case unless their ownership of the crops and right to mort-gage them was made an issue, and no such question was raised in the case either by the pleadings or the proof.

Therefore, as we have shown, the only questions in the case were whether Kim and Hahn, having mortgaged the crops to plaintiff, tortiously removed the same from the land on which they were grown and sold them to the answering defendants, and, if so, whether the latter purchased the said crops with knowledge before and at the time of the purchase that the crops were under mortgage and had been removed and sold wrongfully or without the knowledge and consent of the mortgagee.

The cases mentioned by appellant as in support of his position that the ruling striking out the lease from the record was error and prejudicial to his rights promulgate very sound and wholesome rules, but, while applicable in proper cases, have no application to the instant case upon the theory upon which its issues were framed and tried.

The judgment is affirmed.

Prewett, P. J., *pro tem.*, and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 19, 1921, and the following opinion then rendered thereon:

THE COURT.—The application for a hearing in this court after decision by the district court of appeal of the third appellate district is denied, without reference to or intimation of view on our part relative to the correctness of the discussion in the opinion on the question of the proper construction of the chattel mortgage as covering the personal property here involved, and the question of the validity of the notary's acknowledgment in the matter of such chattel mortgage. The opinion shows that the nonsuit was properly granted in that the removal and sale of crops here involved was not tortious, and also that the trial court did not err in denying motion to strike out certain denials of the answer, or in striking out the lease theretofore received in evidence.

All the Justices concurred.