## FARMERS' NAT. BANK v. MISSOURI LIVE-STOCK COMMISSION CO.

No. 9068.

Circuit Court of Appeals, Eighth Circuit.
Nov. 21, 1931.

Thad B. Landon, of Kansas City, Mo. (William C. Lucas and Ludwick Graves, both of Kansas City, Mo., and G. L. Zwick, of St. Joseph, Mo., on the brief), for appellant.

C. G. Myers, of Chicago, Ill., and Benjamin Phillip, of St. Joseph, Mo. (C. F. Snerly and Myers & Snerly, all of Chicago, Ill., and Culver, Phillip & Voorhees, of St. Joseph, Mo., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and REEVES, District Judge.

KENYON, Circuit Judge.

This suit was brought by appellant to recover against appellee on seven causes of action for alleged conversion of personal property. Appellant claimed by virtue of two chattel mortgages to have a lien on certain cattle purchased by appellee from R. A. Clark and Ed. Oates, mortgagors. The trial court held that the lien of the chattel mortgages had been waived by agents of appellant and directed the jury to return a verdict for defendant (appellee). The ultimate question here is whether or not the court should have submitted the case to the jury. There is no dispute as to the facts, but that is not sufficient to warrant a court in instructing a verdict if different inferences may reasonably be drawn from such facts. The rule is well settled in the federal courts that, where the evidence in a civil case is such that reasonable men in a fair and impartial exercise of their judgment may honestly reach different conclusions, the case is for the determination of the jury. If the evidence is such that the court should not, in the exercise of a sound judicial discretion, permit a verdict to stand if rendered against the party making the motion for an instructed verdict, it is its duty to instruct a verdict. Marshall v. Hines, Director General of Railroads (C. C. A.) 271 F. 165; Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Bowditch v. Boston, 101 U. S. 16, 25 L. Ed. 980.

We are not unmindful of the duty of the court in considering such motion, as explained in Hughes, Federal Practice, vol. 6, p. 363, § 3825, "to take that view of the evidence most favorable to the party against whom it is desired. that the verdict should be directed, and to determine the matter from that evidence, and reasonable and justifiable inferences therefrom."

Appellant is a national banking institution located at Salina, Kan. Appellee is a corporation engaged in the live stock commission business at St. Joseph, Mo., receiving live stock at its stockyards, feeding, caring for, and selling the same, collecting the proceeds from the sale, deducting its commissions or charges, and remitting the proceeds according to the instructions of the shipper. The Minneapolis National Bank is located at Minneapolis, Kan., about twenty-six miles from Salina (referred to hereinafter as the Minneapolis Bank). The Central-Kansas Cattle Loan Company and the Guaranteed Finance Investment Company were two cattle loan companies carried on by Roy C. Gafford. He was president of both, as well as president of the Minneapolis Bank. He was actively engaged in maintaining and conducting the affairs of these three institutions, all of which occupied the same offices at Minneapolis, Kan., and transacted their business in the same rooms. These three institutions were largely engaged in loaning money to farmers and stock raisers of Ottawa county to be used in buying, feeding, and conditioning cattle for the market. These loans were customarily secured by chattel mortgages on the cattle, and the notes were generally made payable to the Central-Kansas Cattle Loan Company or Guaranteed Finance Investment Company at the Minneapolis Bank. These notes were sold by the Minneapolis Bank to different banks. A large number of them, secured by chattel mortgages, were discounted and sold to appellant during the twenty-five years preceding the failure of the Minneapolis Bank, which closed its doors February 9, 1929. The two cattle loan companies of which Gafford was president also became insolvent. The money with which to pay the notes and mortgages given by cattlemen was secured by shipments and sales of the cattle covered by the mortgages, and that had been the general custom for twenty-five years.

R. A. Clark and Ed. Oates were farmers living near Minneapolis, in Ottawa county. They dealt quite extensively in the feeding and conditioning of cattle for the market, financing their operations through the Minneapolis Bank, from which they borrowed money to carry on their operations. Oates at times did a business with Gafford and his institutions totaling $200,000 a year. Clark did a lesser business.

In December, 1928, Clark gave to the Central-Kansas Cattle Loan Company a note in the sum of $8,000 and a mortgage to secure the same upon his cattle, which note was negotiable and payable February 25, 1929, at the Minneapolis Bank. Appellant purchased this note and chattel mortgage on December 27, 1928, and has since that time had both in its possession. Clark listed this note and mortgage as a debt in his petition in bankruptcy filed in March, 1929.

In August, 1928, Oates purchased some two hundred and twelve head of steers, which he brought to his farm in Ottawa county. There is some dispute as to just what he paid for the same, but it was in the neighborhood of $27,000. Two notes were given by Oates to the Guaranteed Finance Investment Company, one for $19,000, maturing

December 3, 1928—the other for $8,000 maturing December 17, 1928; also a chattel mortgage on the cattle to secure the $19,000 note. This $19,000 note and the chattel mortgage were purchased by appellant. The $8,000 note seems to have passed out of the picture. When the $19,000 note was due, appellant received a remittance of $3,000 from the sale of some of the cattle, and there was indorsed on the note, "January 14, 1929, paid $3,000.00, 20 steers sold." A renewal note for $16,000 was given.

Clark and Oates had no knowledge that appellant was the owner of these notes and mortgages, and appellee had no actual knowledge of their existence. The mortgages were duly recorded in Ottawa county.

In January and February, 1929, appellee received and sold for Clark some ninety-three head of cattle covered by the chattel mortgage. A small portion of the proceeds went to Clark in cash, and the balance was remitted to the Minneapolis National Bank and deposited to Clark's account there. In December, 1928, and January and February, 1929, appellee received and sold for the account of Oates over two hundred head of steers covered by chattel mortgage owned by appellant. Drafts which had been made by Oates at the time of the shipments against appellee through Gafford and the Minneapolis Bank were paid by appellee and deposited to Oates' account in the Minneapolis Bank. The balance of the proceeds was remitted and deposited by appellee to Oates' credit in the Minneapolis National Bank. The system employed in debiting the accounts of both Clark and Oates in the Minneapolis Bank was peculiar. The debits were not ordinarily made pursuant to checks drawn by them, but were made by Gafford on his own responsibility. Sometimes, after sales of cattle and depositing of proceeds in the Minneapolis Bank, they would take care of their notes and mortgages by giving checks. This had been customary for a number of years, and both Clark and Oates seem to have paid little attention to their accounts in the bank. Clark testified he had intended to go to the bank and make out checks to cover his note, here involved, but, before he had opportunity to do this, the bank failed. The receipt of the cattle of Clark and Oates is the basis of the claim of conversion of property by appellee upon which appellant had a lien.

There can be no question under the evidence that the Minneapolis Bank and Gafford not only authorized Clark and Oates to sell the cattle covered by the chattel mortgages, but the sales were made under Gafford's direction, and for the purpose of this case the Minneapolis Bank and Gafford are one. Clark testified in relation to his first shipment that Gafford told him they were getting more at St. Joseph for cattle than at any other market, and asked him to ship the same to St. Joseph; that Gafford knew about the shipment of the second consignment of Clark's cattle, and requested that the same be shipped. Gafford knew of all the different shipments made by Oates, and urged him to ship the cattle. Oates testified: "At times he urged me to ship the cattle, in a way requesting me so to do. He thought it was better to get them out." When the proceeds from the sale of the Oates' cattle were deposited in the Minneapolis National Bank, Oates' account was credited with the same, and sufficient funds were removed to pay the note in question. This was all attended to by Gafford.

It is not seriously contended by counsel for appellant that Gafford and the Minneapolis Bank did not authorize Clark and Oates to sell the cattle covered by the chattel mortgages. Counsel in its brief states: "There is but one question in this case. Is the evidence introduced by the plaintiff such that but one conclusion could be drawn therefrom and which would justify the court in declaring as a matter of law that the actions and conduct of the defendant, taking into consideration the evidence of Clark and Oates and the course of dealing between the plaintiff bank and the Minneapolis National Bank and R. C. Gafford, constituted the Minneapolis National Bank and/or Gafford, the appellant's agent?" And in the reply brief says: "We have always conceded, so far as Oates is concerned, that if Gafford in permitting the shipment of cattle and taking charge of the proceeds was the agent, either expressly, authorized or impliedly by a course of dealing, then and in that event, so far as the Oates note and mortgage is concerned, we cannot recover."

█ The case is reduced to the one question of whether the Minneapolis National Bank and Gafford were acting as agents of appellant and within their authority in permitting the sale of the cattle covered by the mortgages. If they were, there is no conversion. The trial court found as a matter of law they were. Did it err in not submitting this question to the jury?

█ The evidence shows that for twenty-five years appellant had been purchasing from the Minneapolis Bank and Gafford cattle notes secured by chattel mortgages; that ap-

pellant had full faith and confidence in Gafford and the Minneapolis Bank, and believed the bank to be in sound financial condition. Mr. Geis was president of appellant bank. He visited back and forth with Gafford, and their relationship seems to have been rather close. The Minneapolis Bank kept a continuous balance with appellant bank, and appellant bank customarily discounted its paper and that of Gafford's cattle loan companies. Appellant relied upon the statements of Gafford as to cattle paper received from his companies. It never inspected the cattle described in any of the chattel mortgages or made any investigation of the collateral that came with the discounted paper; it never notified, prior to the date the Minneapolis Bank closed, the makers of the notes and mortgages which it purchased from the Minneapolis Bank or the Gafford companies that it was the owner thereof; it never tried to collect any of these notes directly from the makers. They were collected by the Minneapolis Bank and Gafford. In September, 1927, it had taken a guaranty from the Central-Kansas Cattle Loan Company, the Guaranteed Finance Investment Company, and Gafford, in the sum of $150,000 to protect it as to paper that should be discounted for either of the two loan companies by appellant bank. Gafford and the Minneapolis Bank supervised the marketing and sale of cattle described in the various mortgages purchased by appellant. It was the custom that the notes and mortgages would be sent to the Minneapolis Bank for collection about ten days before the notes would mature. The evidence shows that, when they were not paid at maturity, a renewal note was executed and forwarded by the Minneapolis Bank to appellant. Appellant would accept this note without question or investigation. Sometimes the Minneapolis Bank would make a partial collection on the notes and take a renewal for the balance, and the original note and mortgage would be returned to appellant. The testimony shows that there was never a time when the appellant bank refused to accept these partial payments. Gafford exercised authority to grant extensions or take new notes. Appellant bank approved of such procedure. In taking the renewals Gafford would explain to appellant the reason therefor, such as the condition of the cattle not warranting putting them on the market, or the unfavorable condition of the market. When the appellant bank received word from the Minneapolis Bank of collections upon the various notes and mortgages, it would charge the same to its Minneapolis Bank account. These partial payments on notes were made when cattle were shipped and sold prior to the maturity of the notes. Appellant knew it was customary for the mortgagor to sell cattle in small lots as they were prepared for market and to remit the proceeds to the Minneapolis Bank. Appellant bank relied on the Minneapolis Bank to collect the paper and account for the proceeds derived from the sale of the cattle and to protect its interests. It knew the money to pay the cattle notes was derived from the sale of cattle covered by the mortgages. The evidence shows that during all the twenty-five years appellant never objected to the acts of mortgagors in shipping and selling cattle, under the direction and authority of Gafford and the Minneapolis Bank, covered by the chattel mortgages securing the notes taken by Gafford's companies and sold to appellant, or to having the proceeds sent to the Minneapolis Bank. This general custom of handling cattle paper throughout all these years was testified to very fully by Mr. Geis, president of appellant bank. His testimony is refreshing in its candor, although fatal, we think, to appellant's case. He did not evade or attempt to secure any unfair advantage. He was an exceedingly honest witness. His testimony is absolutely conclusive as to the agency of Gafford and the Minneapolis Bank. He testified to the general situation throughout the twenty-five years, the manner in which business was carried on between the appellant bank and Minneapolis National Bank, the purchase of the notes and chattel mortgages of Clark and Oates from the Minneapolis Bank, the renewals of the Oates note; to the letter from Gafford to appellant of January 14, 1929, which letter will be hereinafter referred to. We quote rather liberally from Mr. Geis' testimony:

"There has been a great number of notes secured by chattel mortgage purchased by the plaintiff bank in the last twenty-five years through R. C. Gafford and the Minneapolis National Bank. As I stated, we never, at any time, inspected the cattle. We never, at any time prior to the 9th day of February, 1929, notified any of the different mortgagors and makers of these notes which we purchased from the Minneapolis National Bank that the plaintiff bank had purchased the same and that the bank owned these notes and mortgages. We were collecting the notes direct from the makers when we sent them to the Minneapolis National Bank. We were collecting them ourselves through the usual custom. We never attempted at any time to collect the notes and chattel mortgages direct from the mortgagors themselves.

During the twenty-five years time, we have collected these notes through the Minneapolis National Bank. I have not, personally, and neither has any other officer of the plaintiff institution, tried to collect any of these notes direct from the maker thereof. We have never had occasion so to do. During the entire period of time the collections have been made by the Minneapolis National Bank for the plaintiff."

"To my knowledge, with reference to these different notes secured by chattel mortgage upon cattle which we have purchased from and through the Minneapolis National Bank and R. C. Gafford during the last twenty years of time, the facts are that no person, corporation, individual or individuals ever supervised and collected these notes, or ever supervised the marketing and sale of the cattle described in the different mortgages other than the Minneapolis National Bank of Minneapolis, Kansas. To my knowledge no other person, partnership, individual or individuals, association or corporation other than the Minneapolis National Bank and its president, R. C. Gafford, ever arranged with any of the different makers of these mortgages and notes for the renewal of these notes and mortgages during this twenty or twenty-five years of time."

"We had not notified the makers of the notes that we owned the notes and mortgages. We expected the makers of the notes to go where the notes were payable and we expected them to go to the Minneapolis National Bank, expected them to go there and pay it and after they paid it we expected them (meaning the Minneapolis National Bank) to send it to us. That had been true during all these years of time with all these notes and mortgages."

"We have never objected at any time to the fact that these different mortgagors had sold the cattle described in the mortgage and sent the proceeds to the Minneapolis National Bank. We never at any time objected to the mortgagor selling the cattle when we received the proceeds and that has been true during all these years of time."

"The facts are we did not protest to Mr. Gafford about him shipping the cattle. We did not register any objections or any protest to anyone about Ed Oates having shipped and sold those cattle. Now at that time we were informed by Mr. Gafford in that letter that Mr. Oates intended to ship the balance of the cattle before the maturity of that renewal note. We did not object or protest to Mr. Gafford against Mr. Oates shipping and selling those cattle. We did not make any protest or objections to anyone after we were informed that Mr. Oates intended to ship these cattle before the maturity of this last renewal note against him shipping and selling the cattle. As a matter of fact, we had no objection to that act at that time if they paid our note. They sold them subject to the mortgage. Now with reference to all those notes upon which partial payments were made at maturity and renewal note executed for the balance we had no objection to the mortgagor shipping and selling the cattle described in those mortgages securing those notes if the money came to us. If the money came to us we had no objection, that is true. That has been true during all these years of time and is a general custom. That has been true with reference to all these notes and that has been true with reference to all the mortgages in question."

The letter to which he refers in his testimony is as follows:

"R. C. Gafford, President
"Geo. A. Porter, Vice President
"W. C. Nelson, Cashier
"M. J. Crawford, Asst.

"The Minneapolis National Bank
"Capital and Surplus, $75,000.00

"Minneapolis, Kansas, January 14, 1929.

"Dear Raym: I would like for you to take this P. B. Haddock note of $9,000.00 in place of his note of $12,000.00 due today, if you will.

"Also would like a short time renewal of $16,000.00 of the Ed Oates note of $19,000.-00 also due today. He shipped out one car of cattle to try the market and they brought him $150.00 per head and we have indorsed $3,000.00 on the original note proceeds of 20 steers. He will ship all of the balance of the cattle by the maturity of the extension, Feby. 25th.

"Our friends haven't visited us as yet altho I am looking for them every day.

"In order to have our books correspond I will give you these entries the way I figure them and if Bruno makes them any different I wish you would call me this P. M. We are credited your account as follows:

| P. B. Haddock | $12,000.00 | | |
| Ed Oates | | 19,000.00 | Total $31,000.00 |
| We debit you | | | |
| P. B. Haddock | $9,000.00 less discount $199.50 | | $8,800.00 |
| E. Oates | 16,000.00 less discount 112.00 | | 15,888.00 |
| | | | $24,688.00 |

"With kindest personal regards, I am,
"Yours very truly,
"[Signed]  R. C. Gafford, Pres."

From this letter it appears that appellant actually received $3,000 of the money secured by Oates for sales of cattle covered by the mortgage, with notice that the rest of the cattle would be sold and shipped. It offered no objection to the plan. Having done this, it was not in position to question the authority of Oates to sell the cattle. There is no doubt that appellant, in view of this letter, understood and expected that Oates should ship the cattle, that the money should be remitted to the Minneapolis National Bank in accordance with the long-established custom and method in which business had been carried on between these banks, and that appellant looked to the Minneapolis National Bank for the proceeds of said sales to be properly applied on the note of Oates, and this is exactly what the Minneapolis National Bank did. The case is not so strong as to the Clark mortgage, but, with the course of dealing by which mortgagors were selling cattle in small bunches and applying the proceeds on the notes, appellant undoubtedly intended that the Minneapolis Bank should take charge of the proceeds just as it did, and, if there had been no failure of said bank, everything would have been satisfactory.

When the Minneapolis Bank failed, it undoubtedly had received the proceeds from the sale of the mortgaged cattle in an amount sufficient to take up the mortgage notes. No checks had been drawn by Clark or Oates for the purpose of paying these notes, and, as far as the record is concerned, the proceeds from the sale of mortgaged cattle other than the $3,000 remitted by the Minneapolis Bank on January 14, 1929, never reached appellant bank in payment of the mortgage notes. Whatever became of these proceeds the record does not disclose. They were not received by appellant bank, and they were no longer to the credit of Clark and Oates in the Minneapolis Bank. However, the proceeds went to the agent of appellant bank, duly authorized to receive the same. What became of them after that is problematic.

■ We do not discuss the issue of payment of these notes or the claimed invalidity of the Clark mortgage. It is unnecessary. The situation here is not, as contended by counsel, we think, the same as though Clark and Oates were being sued as obligors of the mortgage notes. Such suit would be on contract, and the defense would be payment. This suit is in tort for conversion of the mortgage security, and payment of the notes is not relevant on the issue of conversion. The claim of conversion rests upon the wrongful acceptance by the appellee of the mortgaged cattle. If the mortgagee or his duly authorized agent consented thereto, it was not unlawful or wrongful. The fact that appellee did not know the cattle received were subject to appellant's mortgage is immaterial on the question of tort liability, and makes no difference as to the claimed waiver. There can be no question of doubt under this evidence that appellant bank from the time the Clark and Oates notes were acquired by it knew that the mortgaged cattle of Clark and Oates would be shipped as they became conditioned for the market and sold for the purpose of paying the notes; that it constituted the Minneapolis Bank and Gafford its agents to supervise the marketing and sale of the cattle and to protect its interest in the proceeds; that Gafford and the Minneapolis Bank consented to the shipment of these cattle, and actually directed the proceedings and received the proceeds. There is no other conclusion to be drawn than that there was a complete waiver of appellant's lien.

From the multitude of cases bearing on the question of waiver of lien by consent to sale of the mortgaged property, we cite only a few. Great Northern State Bank v. Ryan (C. C. A.) 292 F. 10; Moffett Bros. & Andrews Commission Co. v. Kent (Mo. Sup.) 5 S.W.(2d) 395; Minneapolis Threshing Machine Co. v. Calhoun et al., 37 S. D. 542, 159 N. W. 127; Seymour v. Standard Live Stock Commission Co. of South Omaha et al., 110 Neb. 185, 192 N. W. 398; Warrick v. Rasmussen, 112 Neb. 299, 199 N. W. 544; Colorado Motor Finance Co. v. Smith, 72 Colo. 150, 210 P. 73.

■ That consent to sale waives lien whether purchaser knew of lien or not, see Luther v. Lee, et al., 62 Mont. 174, 204 P. 365.

■ That consent may be shown from implication arising from a course of conduct as well as by express words, Stockyards National Bank of South Omaha v. B. Harris Wool Co., 316 Mo. 426, 289 S. W. 623; Livingston et al. v. Stevens, 122 Iowa, 62, 94 N. W. 925.

Mr. Geis testified that the cattle were sold subject to the mortgage. Of course, that is a mere conclusion of his which as a matter of law is erroneous. The fact of sale as pointed out in Moffett Bros. & Andrews Commission Co. v. Kent (Mo. Sup.) supra, is inconsistent with continuation of the mortgage lien. Appellee had no notice of

any such condition, and would not be bound thereby.

If property included in a chattel mortgage is sold with consent of mortgagee, the selling or taking is not a wrong, and hence cannot constitute a conversion as is here charged. Ramsey v. California Packing Corporation et al., 51 Cal. App. 517, 201 P. 481. [10,11] Agency and an agent's authority may be established by circumstances. Agency may be implied as well as express. First National Bank of Seattle v. Hessell et al., 133 Wash. 643, 234 P. 662; Colorado Title & Trust Co. v. Childers et al. (C. C. A.) 256 F. 307; Knox College v. Gray et ux. (C. C. A.) 299 F. 179; Wisconsin & Arkansas Lumber Co. v. Day (C. C. A.) 35 F.(2d) 563.

Our conclusion in this matter makes it unnecessary to consider the argument of appellant that in receiving the proceeds of the mortgage securities the Minneapolis Bank was placed in the position where it had interests opposed to those of its principal, or that it was acting as the agent of Clark and Oates in debiting their accounts. These arguments relate to the defense of payment with which we are not concerned.

There was nothing as a matter of law in the relationship of Clark and Oates and Gafford to preclude Gafford and the Minneapolis Bank from giving consent as agents of appellant to the shipment and sale of the cattle, the lien upon which was to secure these notes alone.

We have carefully reviewed this testimony, and are satisfied that the court committed no error in instructing a verdict for appellee, and its judgment is affirmed.