Stockyards National Bank of South Omaha, Appellant, v.
B. Harris Wool Company.

Division One, December 31, 1926.

**1. CHATTEL MORTGAGE: Sheep and Wool: Conversion: Waiver: Acquiescence in Sale.** Notwithstanding a mortgage on sheep and wool is recorded in the proper county and constitutes constructive notice to a dealer in wool who contracts with the mortgagor for the sale and consignment of the wool to him, the mortgagee may impliedly acquiesce in or consent to the sale or consignment of the wool by the mortgagor and thereby waive the lien or security of the mortgage, and estop himself to sue the purchaser for the conversion of the wool or the proceeds thereof paid to the mortgagor.

**2. ———: Waiver: Sale with Consent.** The purchaser of mortgaged personal property takes the title free from the lien of the mortgage, if the sale is made by the mortgagor with the express or implied consent of the mortgagee.

**3. ———: Facts Constituting Waiver and Estoppel.** The chattel mortgage on sheep and wool having been executed on March 26th and recorded on April 4th, and the notes and security having been assigned by the mortgagee to the plaintiff bank on March 26th, and the wool on May 6th having been consigned by the mortgagor to the defendant wool dealer, who made an advance payment, and who, after the wool had been clipped in June, in July, upon receipt of the wool, made a further payment, knowledge by the assignor of the notes and the chief officer of the bank that it is the universal custom to shear wool from sheep in the spring of the year, between April and July; and their undisputed testimony that they expected the mortgagor to clip and dispose of the wool, and relied upon him to turn over the proceeds of the sale to the holder of the notes; that neither of them arranged to look after the clipping of the wool or its disposition; that they knew that the wool would be consigned by the mortgagor to some licensed wool dealer, to be handled under wartime Government regulations; that they were at the time familiar with the Government regulations, which authorized an advance to wool growers up to seventy-five per cent of the fair estimated market value of the wool; and that they failed to look after the mortgage security, permitted the mortgagor to clip the wool, to consign and sell it to the defendant and to receive from him advancements thereon according to the Government regulations, without attempting to ascertain to whom he was selling or assigning it, and without either seeing that the advances were applied by the mortgagor upon the mortgage debt or demanding that the advances be turned over to the bank to be so applied, constitute waiver of the lien of the mortgage security, and estop the bank from recovering, as for wrongful conversion, from the defendant the amount of the payments so made to the mortgagor.

**4. ———: Application of Consent: Consignment to Factor for Sale: Government Regulations.** A licensed wool dealer was not a mere consignee or factor of the mortgagor under the Government wartime regulations, whereby the wool clip of 1918 was to be handled and distributed by designated dealers, who were to advance to the wool grower, upon consignment to them, seventy-five per cent of its fair estimated value, and to turn it over to the Government if required by it, or to distribute it to civilians to whom the Government might allocate it, and in either case to pay the wool grower the remainder of the purchase value as soon as the price was fixed by the Government, and therefore the sale and shipment of wool by

the mortgagor, with the express or implied consent of the mortgagee, to a licensed dealer, were not a mere consignment for sale upon commission, with power in the mortgagee to withdraw its consent and recover the wool at any time before its actual sale by the dealer, but such licensed dealer was a purchaser or incumbrancer, at least **pro tanto**.

5. ――――: ――――: ――――: ――――: **Materiality.** It is not material, in a suit by the mortgagee to recover the amount of money paid by the dealer to the mortgagor for wool consigned to him, with the mortgagee's consent, whether the dealer was a mere factor to whom the wool was to be sold on commission, for still the dealer was lienor or purchaser **pro tanto** to the extent of the advance payments made. The dealer having acquired a special property in the wool and being a purchaser **pro tanto** or an incumbrancer to the extent of the payments made prior to and at the delivery of the wool, the mortgagee could not withdraw its implied consent that the mortgagor might sell the wool, after the rights and status of the dealer, as such purchaser and incumbrancer, had attached and become fixed.

6. ――――: **Conversion: Purchase Price: Recovery of Unpaid Balance.** Where plaintiff, the holder of notes secured by a chattel mortgage, the lien of which he has waived by his implied consent that the mortgagor might sell the goods covered by the mortgage, charges the defendant, to whom the mortgagor sold the goods, with conversion of the goods to his own use and seeks to recover damages for such conversion, he is not entitled to recover the unpaid balance of the agreed purchase price remaining in the defendant's hands. The action is one at law for the conversion of goods, and he must recover, if at all, upon the cause of action alleged.

7. ――――: ――――: ――――: ――――: **Willingness to Pay.** Plaintiff is not entitled to the surplus proceeds of a sale of goods in the purchaser's hands where the evidence totally fails to prove a conversion. Where the evidence tends to show that the defendant has never refused to pay over the balance of the agreed price for goods bought by him, to the party lawfully entitled thereto, that he disclaims any title or interest therein, and expresses a willingness to pay the same into court, or to the proper party, when an appropriate proceeding is brought to·determine to whom it belongs, there is no conversion.

8. ――――: ――――: **Waiver of Lien: Proceeds of Sale: Estoppel.** The mortgagee who has waived his mortgage lien on goods by his implied consent to their sale by the mortgagor, is estopped to sue the purchaser for the conversion of either the goods or the proceeds of the sale, and cannot in his action for conversion recover the unpaid balance of the agreed sale price in the hands of the purchaser.

Corpus Juris-Cyc. References: **Appeal and Error**, 3 C. J., Section 618, p. 718, n. 50. **Chattel Mortgages**, 11 C. J., Section 339, p. 624, n. 35; p. 626, n. 55 New; Section 340, p. 627, n. 77, 81; Section 342, p. 630, n. 53 New; Section 348, p. 635, n. 49; Section 349, p. 635, n. 57; Section 351, p. 636, n. 71; Section 352, p. 636, n. 75; Section 441, p. 674, n. 18, 19, 20, 22.

Appeal from Circuit Court of City of St. Louis.—*Hon. Charles B. Davis*, Judge.

AFFIRMED.

*S. T. G. Smith* and *Thos. S. Meng* for appellant.

(1) Consent of the mortgagee to sale of the mortgaged property by the mortgagor does not discharge the mortgage lien unless the

property is actually sold pursuant to such agreement. Here it is conceded that the property had not been sold (but was in the possession of defendant, mortgagor's agent) at the time plaintiff asserted its rights under the mortgage, demanded possession of the mortgaged property and brought suit in replevin therefor. Sexton v. Besheard, 21 Ida. 338. Defendant having sold the mortgaged property as the agent of the mortgagor, and having denied the validity of plaintiff's mortgage, was clearly liable for conversion of the property. Dusky v. Rudder, 80 Mo. 400; Banking House v. Brooks, 52 Mo. App. 364; Shaphard v. Hynes, 104 Fed. 452. Particularly is this true where the mortgagee's consent to the consignment was upon the condition that it receive the proceeds of the property, and the evidence showed that such condition had not been complied with. (2) Consignment of property merely signifies the delivery of possession of property to another than the owner. Sturn v. Baker, 150 U. S. 326; Block v. Col. Ins. Co., 47 N. Y. 403; Harris v. Coe, 71 Conn. 163; McDonald Comm. Co. v. Boggs, 78 Mo. App. 31. (3) The release of a mortgage of record is open to explanation the same as a receipt. If a release is made by mistake or misapprehension and no intervening rights have been acquired on the faith of the apparent release, it may be disregarded and the original lien enforced in priority to liens subsequently attaching. Christy v. Scott, 31 Mo. App. 337; Seiberling v. Tipton, 113 Mo. 373. Plaintiff had accepted the renewal mortgage in the belief that it was a valid instrument. There being no suspicion of fraud on plaintiff's part with respect to the alleged alteration, the validity of its debt was not affected. Marth v. Wiskerchen, 186 Mo. App. 515. Plaintiff was therefore entitled to enforce its original mortgage lien. (4) Defendant being merely a factor, had no other or greater rights in the wool than its principal, Wrathall, and was clearly guilty of conversion. Arkansas City Bank v. Cassidy, 71 Mo. App. 199; Koch v. Branch, 44 Mo. 546; Spraits v. Hawley, 39 N. Y. 444; Lafayette Co. Bk. v. Metcalf, 29 Mo. App. 384; Natl. Bk. Com. v. Morris, 114 Mo. 255; Lehman v. Schmidt, 87 Cal. 21.

*Jones, Hocker, Sullivan & Angert* for respondent.

(1) Independent of any consideration of the errors assigned by the appellant, the judgment should be affirmed because, for various reasons, the defendant's demurrer to the evidence should have been sustained. (a) The mortgage of September 28, 1917, was effectually discharged by the cancellation of the notes, the recorded release, the delivery of the canceled notes and mortgage to Wrathall, and taking of the new notes and mortgage of March 26, 1918. 5 R. C. L. p. 453, sec. 88; 11 C. J. 684; Brown v. Dunckel, 8 N. W. (Mich.) 537;

Herr v. Milling Co., 22 Pac. (Colo.) 770. (b)   The mortgage of March 26, 1918, given in discharge of the first, was made payable to Stockmen's Securities Company, a new payee, by reason of which there was a complete novation.   29 Cyc. 1137; Carman v. Harrah, 182 Mo. App. 365; Sherer v. Rubedew, 11 Ida. 536; Bunn v. Lindsay, 95 Mo. 259.   (c)   The mortgage of March 26, 1918, so far as it attempted to cover growing wool on the sheep, was invalid and unenforceable against the defendant.   Under the statutes of Idaho and at common law a mortgage on growing wool is good only in equity between the parties thereto and against third parties with actual notice.   The enumeration of personal property which may be mortgaged under the Idaho statute is exclusive of all other forms of personal property.   Rev. Code of Idaho, 1908, sec. 3406; Idaho Comp. Stat. 1919, secs. 6373, 9460; Beeler v. Mercantile Co., 8 Ida. 644; Dover Lumber Co. v. Case, 31 Ida. 276; Case Note, 1 L. R. A. (N. S.) 451.   If it could be said that the law of Idaho on this subject is not settled by the foregoing authorities, it is presumed to be the same as the law of Missouri, about which there can be no dispute, New Eng. Bank v. Nat. Bank, 171 Mo. 307; Littlefield v. Lemley, 75 Mo. App. 514.   (d)   Even if the mortgage of March 26, 1918, could be held valid, the evidence conclusively shows that the plaintiff consented to or acquiesced in the sale or consignment of the wool by Wrathall, relying on him to apply the proceeds on the mortgage. The plaintiff is therefore estopped to sue for conversion, or in any manner defeat the rights of the defendant, acquired in ignorance of the mortgage.   Knollin v. Jones, 7 Ida. 466; Mills v. Glennon, 2 Ida. 105; Bellevue Bank v. Hailey Nat. Bank, 215 Pac. (Ida.) 126; Peoples v. Whitworth, 238 Pac. (Ida.) 306; Smith v. Seed Co., 232 Pac. (Ida.) 574; Hare v. Young, 26 Ida. 691; 21 C. J. 1172; 5 R. C. L. p. 445; Jones on Chattel Mortgages, secs. 457, 457a; Case Note, 43 L. R. A. (N. S.) 302.   An agreement allowing a mortgagor to sell the mortgaged property and apply the proceeds on the mortgage amounts in practical effect to a substitution of the personal obligation of the mortgagor for the security of the mortgage.   Ramsey v. Packing Co., 201 Pac. (Cal. App.) 481; St. Louis Drug Co. v. Robinson, 81 Mo. 18; Randal v. Buchanan, 61 Mo. App. 445; Fields v. Wagon Co., 109 Mo. App. 84; Dodson v. Dedman, 61 Mo. App. 209. (e)   The mortgage of March 26, 1918, is invalid as against the defendant because it was not filed for record as required by the statutes of Idaho.   The sheep were in Minidoka County when the mortgage was made and executed in favor of the Stockmen's Securities Company, and they remained in that county until April 4, 1918. Since the mortgage was never recorded in Minidoka County, where the sheep were located and kept at the time of the execution of the mortgage, no lien ever attached as against third persons without ac-

tual notice, even though the mortgage was afterwards recorded in Cassia County, where the sheep were later taken. Cowden v. Mills, 75 Pac. (Ida.) 767; Hales v. Zander, 103 Pac. (Okla.) 669; Pollak v. Davidson, 6 So. (Ala.) 313; Burlington State Bank v. Bank, 166 S. W. (Ky.) 499; Yund v. First Nat. Bank, 82 Pac. (Wyo.) 7; Powers v. Freman, 2 Lans. (N. Y.) 127; First Nat. Bank v. Wood, 50 N. W. (Mich.) 869; Hansboro State Bank v. Elevator Co., 179 N. W. (N. D.) 669; Muller v. Bardshar, 205 Pac. ( Wash.) 845; Farmers' Bank v. Bank of Britton, 23 Pac. (Okla.) 914; Fasset v. Wise, 47 Pac. (Cal.) 1095; Sublett v. Hurst, 164 S. W. (Tex. App.) 450; Bailey v. Culver, 175 S. W. (Tex. App.) 1083; Brinnberry v. White, 167 S. W. (Tex. App.) 207; Cappon v. O'Day, 162 N. W. (Wis.) 655; J. H. Davis & Co. v. Thomas, 45 So (Ala.) 898. In so far as the Missouri statute is analogous, the Missouri decisions support the foregoing proposition. In this State the provision of our statute that a mortgage be filed where the mortgagor resides means where the mortgagor resides at the time of the execution of the mortgage. Bank v. Metcalf, 29 Mo. App. 394; Bank of Commerce v. Morris, 114 Mo. 262; Bevans v. Bolton, 31 Mo. 437; Lasswell v. Henderson, 144 Mo. App. 396; Bank v. Heading Co., 198 Mo. App. 601. Neither did the plaintiff comply with the other section of the Idaho statutes which provides that in case of removal of the property from one county to another, the mortgage shall be filed in such other county within ten days thereafter. The sheep were removed from Minidoka County on April 4, 1918, but no attempt was made to file the mortgage in Cassia County until May 10, 1918. Rev. Code of Idaho, sec. 3410; Ida. Comp. Stat. 1919, sec. 6377. (2) If a chattel mortgage is altered after execution, without the consent of the mortgagor, it is unenforceable. Stringer v. Mfg. Co., 189 Mo. App. 337; Forsee v. Zenner, 193 S. W. (Mo. App.) 975. And in this State all such alterations are material Kelley v. Thuey, 143 Mo. 434; Carson v. Woods, 177 S. W. (Mo.) 623. (3) The word "consignment," as used in this case, should be understood in the sense of "shipment" and not as a delivery to a factor for sale on commission. There was no agreement of agency as in the ordinary case where goods are delivered to a commission merchant for sale. The defendant took the wool as purchaser unless it was taken by the Government. The transaction was not the result of agreement merely, but resulted from Government regulations under war powers. Commonwealth v. Harris, 32 Atl. (Pa.) 92; Hardy v. Munroe, 127 Mass. 64; Gillespie v. Winberg, 4 Daly (N. Y.) 318; 1 Bouv. Law Dict., p. 619.

SEDDON, C.—This is an action for the alleged conversion of a quantity of wool, which was delivered by one Wrathall to defendant, who received the wool, made certain advances thereon to Wrath-

all and disposed of the wool in accordance with certain compulsory regulations promulgated by the United States Board of War Industries, which regulations were shown to be in force and effect during the year 1918. The action was tried to a jury, resulting in a verdict and a judgment thereon in favor of defendant, from which judgment plaintiff has appealed to this court. The judgment *nisi* was affirmed by this division of this court, an opinion, expressing our conclusions, having been prepared by one of the judges of this court, but subsequently a rehearing was granted to appellant. The cause was thereupon reargued, and reassigned to the writer hereof for an announcement of the conclusions of this court. From an examination of a voluminous record, we gather the following salient facts:

Plaintiff, during the times herein mentioned, was a national bank, with its principal place of business in South Omaha, Nebraska. Defendant was engaged in buying and selling wool and furs, and had been engaged in such business for many years prior to the transaction herein involved, with its principal office in the city of St. Louis, and maintaining branch offices in Boston, Philadelphia and Salt Lake City. Tagg Bros. & Moorhead was a corporation, with its principal office at South Omaha, Nebraska, and was engaged in buying and selling live stock on commission and in making loans to stock-raisers on live-stock security. The Stockmen's Securities Company was a corporation, organized early in the year 1918, for the purpose of making loans on live-stock security. The two corporations last named, Tagg Bros. & Moorhead and Stockmen's Securities Company, had their principal place of business in the same room, or suite of rooms, located in the Livestock Exchange Building in South Omaha, Nebraska. The two latter corporations were owned, to a large extent, by the same group of stockholders, although a few of the minority stockholders in Tagg Bros. & Moorhead were not stockholders in the Stockmen's Securities Company. In other words, both corporations were apparently owned and controlled by interlocking stockholders.

In September, 1917, Wrathall, who was a sheep-raiser and wool-grower in Idaho, was the owner of supposedly 3,000 head of sheep and had contracted with one Warren for the purchase of an additional 5,000 head, more or less. Wrathall did not have the money with which to purchase the sheep which he had contracted to buy from, or through, Warren. In September, 1917, arrangements were made whereby Tagg Bros. & Moorhead was to make a loan of approximately $80,000 (the estimated purchase price of the 5,000 head of sheep) to Wrathall, to be secured by the 3,000 head he supposedly then owned and the 5,000 head to be purchased by him from, or through, Warren. When the sale from Warren to Wrathall was consummated, it was discovered that there were exactly 4867 head, the purchase price of which aggregated approximately $78,000, which amount Tagg Bros.

& Moorhead loaned to Wrathall and with which Wrathall purchased the 4867 head of sheep.

On September 28, 1917, Wrathall executed and delivered to Tagg Bros. & Moorhead his eight promissory notes in the aggregate principal sum of $78,000, all payable six months after date, securing the payment thereof by a chattel mortgage of even date on all of the sheep, 7867 head. The mortgage described the brands upon the sheep, that the sheep were to be ranged in Cassia County, Idaho, and, furthermore, that "it is the intention of this mortgage that it shall cover and include all wool growing and to be grown on said sheep during the year 1917 and 1918, together with all the increase from said sheep during the life of this mortgage." The mortgage also provided: "This mortgage shall remain in full force until the debt thereby secured shall be fully paid. . . . It is expressly understood that this mortgage covers and secures all extensions or renewals of within described note or notes." The mortgage was filed for record in the office of the Recorder of Cassia County, Idaho, the county where the sheep were then located and kept, on October 5, 1917. On or about October 2, 1917, Tagg Bros. & Moorhead sold the eight Wrathall notes secured by said chattel mortgage to plaintiff bank, endorsing the notes without recourse.

On March 26, 1918, Wrathall executed and delivered to Stockmen's Securities Company eight new notes, all payable six months after date, aggregating the principal sum of $81,120, being the principal and accrued interest then due on the notes of September 28, 1917. At the same time, on March 26, 1918, he executed and acknowledged a new chattel mortgage in favor of Stockmen's Securities Company, as mortgagee, securing the payment of said notes, which were payable to Stockmen's Securities Company, or order, covering the same 7867 head of sheep described in the mortgage of September 28, 1917, with the recital that "said sheep are to be ranged about twenty miles south of Rockland, Power County, Idaho, or 35 miles northwest of Malad, Oneida County, Idaho." The new, or later, mortgage contained the recital: "It is the intention of this mortgage that it shall cover and include all wool growing and to be grown on said sheep during the year 1918, together with all the increase from said sheep during the life of this mortgage." Subsequently to the execution and acknowledgment of said chattel mortgage, the following recital was inserted in the mortgage: "The above-described sheep are now in Cassia County on the trail from Burley to the range in Power County, above described." The mortgage was filed for record in the office of the Recorder of Power County on April 4, 1918, and in the office of the Recorder of Cassia County on May 10, 1918.

On September 28, 1917, when the first mortgage was executed and acknowledged, the sheep were on the Meadow Creek range in Cassia

County. In the latter part of December, 1917, they were driven across the Snake River into Minidoka County. Minidoka County adjoins Cassia County on the north and the dividing line between the two counties is the Snake River. The sheep were kept, ranged and fed in Minidoka County during the ensuing winter and until March 31 or April 1, 1918, on one or the other of which dates they were started back to the bridge across Snake River, entering Cassia County on April 3 or 4, 1918. Thereafter, they were continuously ranged and kept in Cassia County on the Meadow Creek range until they were sheared and their wool was clipped in the latter part of June, 1918. Immediately after the shearing was completed, Wrathall drove about 3750 head, more or less, to Power County, where he sold them.

Certain statutes of Idaho (Revised Code of 1908) were pleaded and put in evidence at the trial as pertinent to the issues raised by the pleadings. These statutes are as follows:

"Sec. 3398. The assignment of a debt secured by mortgage carries with it the security.

"Sec. 3408. A mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and incumbranchers of the property in good faith and for value, unless:

"First. It is accompanied by the affidavit of the mortgagor that it is made in good faith and without any design to hinder, delay or defraud creditors.

"Second. It is acknowledged or proven, as grants of real estate, and the mortgage, or a true copy thereof, is filed for record with the county recorder of the county where such property is located and kept.

"Sec. 3410. When mortgaged personal property is thereafter removed from the county wherein it was situated at the time of the execution of the mortgage by the written consent of the mortgagee, it is, except as between the parties to the mortgage, exempt from the operations thereof, unless, either, (1) the mortgagee within ten days after such removal, cause the mortgage to be recorded in the county to which the property has been removed, or (2) the mortgagee, within ten days after such removal, take possession of the mortgaged property."

After the execution of the two mortgages above mentioned, Wrathall continued in exclusive possession of both the sheep and the wool described therein, until the wool was delivered to defendant and came into its possession. During all such time, neither of the mortgagees named in said mortgages, nor the plaintiff assignee of the notes secured thereby, ever took possession, or attempted to take possession, of either the wool or the sheep.

Both mortgages and both sets of notes were prepared by one Smith, who was an active vice-president of the Burley State Bank at Burley,

316 Mo.—28.

Cassia County, Idaho. The Burley State Bank was a correspondent of plaintiff national bank. As notary public, Smith took the acknowledgments of both mortgages. The mortgages and notes were prepared by Smith upon blank printed forms left with the Burley State Bank for that purpose, Smith filling in the blank spaces in the printed forms upon a typewriter. Upon the execution and acknowledgment, on March 26, 1918, of the new mortgage and the eight notes secured thereby, the mortgage and notes were sent by Warren, who was a director of the Burley State Bank, to Tagg Bros. & Moorhead, South Omaha, Nebraska, and, shortly thereafter, Stockmen's Securities Company, the mortgagee and payee of the new notes, offered the new notes for sale to plaintiff bank. The sale of the new notes by Stockmen's Securities Company to plaintiff was arranged by one Tagg, an officer of the Securities Company, and one Hovey, the vice-president of plaintiff bank. On March 29, 1918, Hovey telegraphed Smith, care of Burley State Bank at Burley, Idaho, inquiring in what county the Wrathall sheep were then located. Smith answered by telegram, stating that the sheep would be in Cassia County the first of the next week. On March 30, 1918, Hovey wrote Smith: "Mr. Tagg is out of the city to-day and before leaving left with me the Wrathall paper. I discovered that the present location of the sheep was indefinite and, therefore, wired you. I now have your reply indicating that the sheep will be located in Cassia County the first of .next week. The mortgages do not mention their being in that county and I am, therefore, sending them to you with the request that such correction as is necessary be made and then the mortgage filed. If you will be good enough to look after this matter for us, we will appreciate it. Would you object ·to wiring me collect when the mortgages are mailed to the Recorder and use every effort to hurry them back to us at the earliest possible moment?"

The testimony is widely divergent and conflicting as to what occurred with reference to the correction of the mortgage after the mortgage had been returned to Smith, who testified: "I called Mr. Wrathall to the bank and told him we had to put in this mortgage the present location of the sheep, and asked him where they were, and he told me, and then we went to the typewriter and added to the mortgage what is shown here, 'The above described sheep are now in Cassia County on the trail from Burley to the range in Power County, above described.' " Smith testified that he operated the typewriter and made the addition to the mortgage in the presence of Wrathall. Wrathall testified: "Some time after the mortgage was made out, possibly a couple of weeks after, I had been· out of town attending to these sheep, and I came in and I got a letter, I think from Omaha, requesting me to go to George A. Smith, and have some change made in the mortgage, but before I got to see Mr. Smith, I met Mr. War-

ren, and I said, 'What about this change in this mortgage, what is it they want done?' He said, 'Why, we fixed that all up.' Q. What did he say about the necessity for your going up to the bank, did he tell you to go up to the bank? A. No, sir, he said it was all fixed up. He waved his hand this way (indicating). Q. Did he tell you a change had been made? A. No, sir. Q. Just tell all he told you about it, if anything. A. There was nothing more. That is all there was to it. Just waved his hand and said it was all fixed up, and we dropped that question. Q. I will show you this original mortgage and call your attention to the sentence, 'The above described sheep are now in Cassia County on the trail from Burley to the range in Power County, above described;' I will ask you if that was in there at the time you signed and acknowledged that mortgage? A. No, sir, because the sheep were over there on the feed ground at that time in Minidoka County. Q. Did they ever ask you for permission to put this in? A. No, sir. Q. Did Mr. Smith ever call you in the bank there and write that in there in your presence? A. No, sir.'' Smith admitted, on cross-examination by defendant, that the mortgage was not signed or acknowledged again by Wrathall after the alteration in, or addition to, the mortgage had been made. The original mortgage, on its face, shows but the one acknowledgment, which is certified by Smith, as notary public, to have been taken on March 26, 1918, the date of the original execution of the mortgage.

On April 3, 1918, Smith wrote to Hovey, vice-president of Stockyards National Bank, South Omaha, Nebraska: ''This will acknowledge receipt of your letter of March 30th enclosing the Wrathall papers. We have today forwarded to Cassia and Power County recorders the mortgages, with instructions to file the original and certify to the copy and forward same direct to you and draw a sight draft on us for their fees, which we will collect from Wrathall. We also wired you to-day that the papers had been sent to be filed and that we had added to the mortgage a note that the sheep were now in Cassia County to summer range in Power County. This was the nearest description we could give as to where the sheep were located.''

The sale of the eight Wrathall notes of March 26, 1918, by the Stockmen's Securities Company to plaintiff bank, was consummated on or about June 4, 1918, the notes being endorsed without recourse by the payee, Stockmen's Securities Company. On June 4, 1918, the eight Wrathall notes of September 28, 1917, were surrendered and delivered by plaintiff to W. B. Tagg of Tagg Bros. & Moorhead, who, on the same day, wrote Wrathall: ''Enclosed please find your notes and mortgage for $78,000, dated September 28, 1917, due the 28th of March, which was taken up by the new loan made you several weeks ago. It seems that we had some difficulty in getting the mortgage back from one of the counties in which the sheep are to be lo-

cated and they did not want to return the old papers until the new ones were properly filed. . . . We are sending release direct to the county recorder to-day. Wish you would advise us about this wool, when you expect to shear and about when we may expect the wool money to apply on this paper. An early reply will be greatly appreciated." On June 5, 1918, Tagg wrote to the Recorder of Cassia County enclosing the release of the chattel mortgage of September 28, 1917, and directing the Recorder to clear the record of the first or earlier mortgage. The release of the earlier mortgage was recorded in Cassia County on June 10, 1918.

The intention of plaintiff bank respecting its purpose in acquiring the new Wrathall paper of March 26, 1918, is best shown by the following testimony of Hovey, vice-president of plaintiff: "Q. Well, did you handle the transaction by which the second bunch of notes were taken into the bank? A. I represented the bank. Q. Who did you deal with at that time? A. Mr. Tagg, I think, of the Stockmen's Securities Company at that time. Q. Now, just tell the jury how that deal was handled? A. Well, Mr. Tagg brought in these notes secured by this mortgage on sheep and wool and offered it for sale, and when it was first offered we were not satisfied with the description. . . . Q. Well, just tell what you did. A. We asked that the description be made more definite. Q. Well, you sent them out to Smith, did you? A. We sent them to George Smith at Burley. . . . Q. And the mortgage was sent out there for correction? A. Yes, sir. Q. And then what happened about this mortgage? A. Well, later the mortgage was completed to our satisfaction and was filed and we purchased the notes secured by this second mortgage. Q. What you actually did was give up the $78,000. There was no new money passed, was there? A. No, sir. Q. You took in this $81,120, evidenced by these eight notes, secured by the mortgage you mentioned? A. Yes, sir. Q. And turned these $78,000 notes and the mortgage securing it, over to whom? A. I don't remember. Q. Well, you surrendered it, did you? A. We surrendered it. Q. And do you remember when that was done, when you finally— A. My recollection is that this last paper was purchased early in June, 1918, I believe. Q. And do you remember when you turned over the $78,000? A. I presume at the time of the purchase of the new paper."

The defendant corporation, in 1918 and for many years prior thereto, was engaged in buying and selling wool and furs. The United States Government had reserved the right to acquire for itself, or for civilians to whom it might allocate the same, the entire wool clip of the United States of the year 1918 for military purposes. Certain regulations were prescribed and promulgated by the United States Board of War Industries for the handling and disposition of the wool

clip of 1918.  These regulations were put in evidence at the trial and the pertinent portions thereof are as follows:

"The War Industries Board has fixed the prices of the 1918 clip of wool as established by valuation committees and approved by the Government as those established on July 30, 1917, at Atlantic seaboard markets.  These values are figured on scoured basis.

"The Government shall have a prior right to acquire all of the 1918 wool clip, or any portion thereof which it may require, at the prices fixed by the War Industries Board.  The remainder will be subject to allocation for civilian purposes under the direction of the War Industries Board.  . . .

"The necessities of the Government at this time are such as to require the use of all existing agencies for concentrating the wool near the centers of consumption.  Therefore all the wool of the 1918 clip must be distributed through approved dealers in approved centers of distribution.

"Approved dealers shall be those dealers authorized by the War Industries Board to handle wool who are located in the distributing centers and who buy from growers direct, through agents, or from country merchants; also those dealers authorized by the War Industries Board who are located in wool-growing districts, and who buy direct from growers and resell, or consign to the dealers in distributing centers.

"Approved distributing centers are the usual well recognized points of distribution.  . . .

"For the reasons before stated, in order that the 1918 wool clip may be promptly concentrated near the manufacturing centers and to make use of every available agency for storing and grading, all Territory Wools must be consigned to one of the designated distributing centers which are as follows:

"Portland, Ore., New York, N. Y., Boston, Mass., Chicago, Ill., St. Louis, Mo., Philadelphia, Pa.  . . .

"As soon as possible after wool reaches the railroad, the owner should load it and consign it to any approved dealer he may select in one of the designated distributing centers. who will there deliver the wool to the Government or to some manufacturer to whom the Government may allot the wool.  These approved dealers will store, insure, handle, and deliver  the wool under Government regulation.  . . .

"The grower shall be entitled to receive an advance up to but not exceeding 75 per cent of the fair estimated market value of his wool.  He shall pay interest on this advance at the rate of six per cent per annum from the date he receives such advance until his wool arrives at the distributing center as shown by the railroad receipt.  It is not intended that the grower shall pay interest on advances after the date

of arrival as shown by the railroad receipt, and he shall be entitled to receive interest on the selling value of his wool after freight has been deducted from the date of arrival. The Government is fixing the price of the 1918 clip on a basis delivered at Atlantic seaboard points. It is therefore incumbent on the grower to deliver his wool at the designated distributing centers, and the expenses of delivering the wool at such centers will be charged against the wool on a basis of the freight rate from point of origin to the Atlantic seaboard.

"As soon as possible after the arrival of the wool at a distributing center, if the wool is to be taken in the original bags, it shall be valued by the Government Valuation Committee. If the wool is to be graded it shall be valued in the piles by the Government Valuation Committee as soon as the piles are graded and ready for delivery. All grading will be conducted under Government supervision. . . .

"Growers shall be entitled to payment on a basis of the date of the arrival of the wool as shown by the railroad receipt. However, as it would be impossible for obvious reasons to make settlement on each clip on the date of its arrival, in order that the grower may lose nothing by any delay in settlement, he shall be entitled to draw interest on the selling price of his wool less freight from the date of the wool's arrival until the date of final settlement.

"Final returns will be made as promptly as possible in all cases.

"The grower does not pay the commission or compensation for handling wools in the designated distributing centers. This commission or compensation for handling will be added to selling prices of the wool and paid by the buyer.

"If sold in the original bags, the commission or compensation shall be three per cent of the selling price. If the wool is graded, the commission or compensation shall be three and one-half per cent of the selling price. This commission or compensation includes drayage, storage, and insurance for a period not exceeding, on any lot, six months after arrival. On any lot remaining unsold in his possession for a longer period than six months the dealer shall be entitled to charge storage and insurance at the market rate, and this additional charge shall be added to the price of the wool."

Defendant's office at Salt Lake City was in charge of one Erickson, who describes himself, in his testimony, as "resident agent of B. Harris Wool Company." One O'Loughlin was a traveling solicitor, or wool buyer, for defendant in Idaho, working under Erickson's supervision. In the latter part of April or early part of May, 1918, O'Loughlin left some blank forms of contract for the consignment of wool to defendant with Smith, the vice-president of Burley State Bank in Cassia County, Idaho. These blank forms of contract were to be filled out by Smith and signed by such of the wool growers as desired to consign their wool to defendant. Smith was not

formally appointed as an agent of defendant and received no compensation from defendant for making up, or filling in, the blank forms of contract left with him by O'Loughlin. The relationship of Smith to the transaction was thus stated by Smith, who appeared as plaintiff's witness: "He [O'Loughlin] told me he was out soliciting wool for the B. Harris Wool Company, soliciting consignments. Q. You told him, did you not, that some of your customers, of your bank, would have some wool to ship? A. Yes, sir. Q. And was there anything said about arrangements being made for this wool to be shipped through O'Loughlin? A. I told him [O'Loughlin] that the customers we had there at the bank, we wanted them to get the biggest advance they could get. At that time the Government had taken over the wool and we wanted to get a man that would advance the most money."

O'Loughlin testified as a witness for plaintiff: "Q. Was he [Smith] working for the B. Harris Wool Company? A. No. Q. How did he happen to be telephoning then? A. He didn't telephone me, George [Smith] never called me in conversation over the phone. Q. Then you were talking to him over the phone? A. That's the idea. Q. Did he call you up, or did you call him up? A. I called him up. Q. What is the object of calling him up? A. Because George favored me and any other customers of the bank. He solicited the wool for us, solicited his own customers for us. He had even gone out on the street and saw sheep men they were carrying, they had loaned money to, mortgage or something, taken them to the hotel to me, said, here is Mr. So and So, has so much wool, like to give it to you, and solicited them for me. Q. Was Mr. George A. Smith getting anything out of this? A. Not a cent, never got a cent. Q. He was a good friend of yours? A. Friend of mine, and helped out his own bank. They wanted the money, I suppose, to call in these loans, one thing and another, and he knew that the wool could not be sold, that the Government was handling it. Therefore he solicited for me, as he liked me."

On or about May 6, 1918, in a telephone conversation between Smith, who was at Burley, and O'Loughlin, who was at Shoshone, Idaho, the former told the latter of the Wrathall wool and that he could get Wrathall to consign it to B. Harris Wool Company if a sufficient advance, 46 or 47 cents per pound, were offered by that company. O'Loughlin agreed to make the advance requested by Wrathall and directed Smith to fill out a contract, have Wrathall sign it, draw a sight draft for $9,000 in Wrathall's favor on the B. Harris Wool Company, Salt Lake City, deliver the draft to Wrathall as a first advance on the wool and forward the signed contract to defendant's Salt Lake City office. Smith carried out the instructions of O'Loughlin, and the draft was presented to Erickson at Salt Lake

City and there paid by defendant. Wrathall had previously deposited the draft in the Burley State Bank and his checking deposit was then credited with $9,000. The consignment contract (so called by O'-Loughlin), prepared by Smith as aforesaid and signed by Wrathall, was as follows:

"Burley, Ida. 5/6 1918.

· "This is to certify that I agree to consign to B. Harris Wool Co. of St. Louis, Mo., our or my 1918 wool clip, being the wool off about 6500 head of sheep now owned by me and estimated at about 50,000 pounds, which I agree to deliver to the said B. Harris Wool Co., or their representative f. o. b. cars at Idahome or Malad on or before June 15, 1918.

"The consideration is advance 46 cents per pound.   Tare 4 lbs. per sack, one per cent discount for tags.

"I hereby acknowledge having received the sum of nine thousand dollars as part payment thereon. The said wool is to be dry, in good sacks, and in good merchantable condition, free from dip and red sand, well tied and honestly packed and I will defend the title to said wool against all and every person whomsoever. These sheep are mortgaged to ————————. Price, interest and all charges at gov't rates.

"(Signed)    J. PERCY WRATHALL.

"Brand of Sheep ————————."

The Wrathall wool was not clipped until the latter part of June, 1918. On or about July 6, 1918, the wool was hauled to Idahome, Idaho, a railroad station on the Oregon Short Line, and there delivered by Wrathall to the freight agent of the railroad, who weighed it, filled out a draft (previously signed and drawn in blank by O'Loughlin on the B. Harris Wool Company, St. Louis, Missouri, in Wrathall's favor, and delivered to the railroad agent for that purpose) for $10,442.36, the balance of the advance under the contract, and delivered the draft to Wrathall, who endorsed it and deposited the proceeds to the credit of his checking account in the Burley State Bank, which bank sent the draft to Stockyards National Bank of South Omaha, Nebraska, plaintiff herein, for collection. The draft was paid by defendant at St. Louis on July 13, 1918. The Oregon Short Line issued to M. Harris, as the named shipper, a bill of lading, evidencing the shipment of wool, dated July 6, 1918, and the bill of lading was forwarded to defendant's St. Louis office. The wool was delivered by the railroad carrier to defendant at St. Louis on or about July 22, 1918. In due course, the wool in controversy was graded and was sold in the latter part of December, 1918, at the price fixed by the valuation committee of the Government, plus commissions and other charges allowable under the regulations promulgated by the Board of War Industries. Upon the final determination

of the purchase price, after deducting the advances made by defendant and other legitimate charges, it was ascertained that the balance due the grower of the wool was $2615.77.

The evidence tends to show that no officer or agent of defendant, unless Smith be deemed to have been an agent of defendant, had actual knowledge or notice of the existence of a mortgage on the Wrathall sheep and wool until the latter part of October, 1918. The evidence also tends to show that no agent of defendant made any examination of the records in the office of the Recorder of Cassia County, Idaho, or of any other county, to ascertain whether there was on file any mortgage covering the Wrathall sheep or wool, at or prior to the time of the delivery of the wool to defendant and the making of the advances thereon to Wrathall. Defendant's solicitor, O'Loughlin, testified: ''Q. Did you make any examination of the records to see whether there was any mortgage on these sheep? A. No. Q. Don't you usually do that when you buy sheep? A. We don't buy sheep. Q. When you buy wool? A. It is not customary in a trade. Q. Take a chance on it, do you? A. Not exactly. Q. Don't you know, and didn't you know at that time practically all of the wool was mortgaged? A. Well, you can't say we knew. We know this, we have a general belief or know, as you say, most of the sheep in the country are mortgaged. Q. And was in 1918? A. That would be like any other year, you know. Q. Yet you made no investigation to see whether there was any mortgage on the sheep or this wool? A. No, it is not customary. If we make an investigation of all the wool we buy, we would spend half of our life in the county building looking those up. We would never get anywhere, and the sheep men would never have any sheep, wouldn't want to monkey with them.'' Defendant's agent, Erickson, testified: ''Q. Did you make any investigation of the records of any county to see whether the sheep on which the wool you got from Percy Wrathall was mortgaged or not? A. No, sir. Q. You did not, you thought Percy Wrathall's credit was all right, did you? A. Yes. Q. And you relied on what you knew about him when you bought this wool, or got it consigned, did you? A. No, sir. Q. Well, you attached a clause in that contract there, did you not, by which you provided 'and I will defend the title to said wool against all and every person whomsoever. These sheep are mortgaged to ————.' You had that in your printed form? A. Yes. Q. What was the object of that? A. To indicate if the sheep were mortgaged. Q. Why did you not examine to see? A. Left that for Mr. George Smith to do. Q. That was for Mr. Smith to look after, and he did not do it? A. He did not do it. Q. That is the trouble, isn't it? A. Yes.''

On October 25, 1918, Tagg Bros. & Moorhead telegraphed defendant: ''This is to advise you that we hold chattel mortgage on wool

shipped you by J. Percy Wrathall, Burley, Idaho, and we will expect balance of proceeds to come to us here. Answer." Defendant replied by telegram on the same day: "Telegram received. As J. Percy Wrathall wool is sold will send balance proceeds providing this is verified by shipper." On October 25, 1918, Tagg Bros. & Moorhead wrote defendant, as follows: "We learned late last night that Mr. J. Percy Wrathall, of Burley, Idaho, on whose sheep we hold a chattel mortgage, has disappeared and we are taking steps to foreclose on our chattel mortgage. We wired you this morning advising you that we had a chattel mortgage on his wool, and would expect the balance of the proceeds to come to us here. Upon receipt of your message acknowledging receipt of our advice we thought best to send you a copy of the chattel mortgage we hold, which is on file in Power and Oneida Counties, in Idaho. . . . We are giving you notice as to our mortgage so that we may procure direct the money that is coming to us under the mortgage. Will be glad to hear just what additional proof, if any, you need, and about when you think the balance of the proceeds will be available." Defendant replied by letter on October 28, 1918: "Your favor of the 25th to hand, with copy of mortgage on the J. Percy Wrathall wool. No doubt you are right in the matter, and have forwarded same to our Salt Lake office, and as it will be fully a month before we have this wool graded, no doubt will hear in the meantime. If we do not hear anything contrary, we will remit you for balance due on the wool." On November 4, 1918, Tagg Bros. & Moorhead wrote defendant: "Replying to your letter of October 28, regarding the balance on the wool shipped by J. Percy Wrathall, Burley, Ida., we hold a mortgage on this wool in the name of the Stockmen's Securities Co. and have already given you formal notice that we would like to have the proceeds sent to us before you send it any place else, and this is to further advise you that we shall hold you responsible if the proceeds are sent any place else. We shall be glad to submit further proof if necessary." Defendant answered on November 5, 1918: "Your favor of the 4th to hand. In regard to balance of wool clip of J. Percy Wrathall of Burley, Idaho, this wool has not been graded or delivered to the Government yet. We will advise you before sending balance due on this wool."

On November 12, 1918, plaintiff bank, by its vice-president Hovey, wrote defendant: "Through Tagg Bros. & Moorhead, a live stock commission company, at the Omaha stock yards, we have been carrying some paper made by J. Percy Wrathall. His wool was shipped to you and we understand there is still a balance due, which just as a matter of information and to keep the record before you, desire to advise that this wool was mortgaged to Tagg Bros. & Moorhead and as holders of the paper, we desire that the money come either to us

or to them.  It will be entirely agreeable to us to have the money sent to Tagg Bros. & Moorhead, if you prefer to do so, or to send it to us.  Mr. Tagg tells me that he has furnished you with a copy of their mortgage.''  On November 14, 1918, defendant wrote plaintiff: ''Your favor of the 12th to hand.  In regard to J. P. Wrathall's clip of wool, we have not made returns for balance of this wool.  As soon as it is valued by the Government, and we have remittance for same, will hold it until same can be distributed to the proper parties.  This will be attended to through our Salt Lake office, who is informed in regard to the mortgage.''

Mr. B. Harris, president of defendant corporation, testified at the trial that defendant was still holding the sum of $2,615.77, the balance of the proceeds, together with accumulated interest thereon, for the benefit of the party or parties who may be shown to be legally entitled thereto, and that said sum had not been used by defendant.

On November 30, 1918, plaintiff brought a replevin suit against B. Harris Wool Company, defendant herein, seeking to recover possession of the Wrathall wool, but being unable to identify said wool, which the evidence tends to show was then probably commingled with other wools in defendant's warehouse, plaintiff dismissed the replevin suit and commenced the instant action on January 18, 1919.

The evidence tends to show that it is customary in Idaho to shear the sheep and clip the wool in the late spring of the year, otherwise the wool will be irretrievably lost because of natural shedding of the sheep or by being torn from the sheep by underbrush.  The evidence is indisputable that neither Tagg Bros. & Moorhead, Stockmen's Securities Company, nor plaintiff bank sent any agent or representative to Idaho on their behalf to look after the clipping of the wool or its disposition after the wool was clipped.  Mr. Tagg testified: ''You knew the wool had been clipped?  A.  Why, you would naturally know in October wool had been clipped, or you wouldn't get much good out of the wool. . . .  Q.  Was it your understanding that you, as mortgagees in this mortgage, were to clip the wool and sell it?  A.  No.  Q.  Who did you expect to do that?  A.  To do what?  Q.  Clip the wool when the proper time came and get the money you refer to in this letter?  A.  The man who had the sheep would be the natural man.  Q.  You mean Wrathall or his man there, is that right?  A.  Wrathall would be the man who would look after it.  Q.  I believe you testified awhile ago that you didn't know until October, or somewhere along there, about the wool having been clipped, but you supposed it had in the spring, is that right?  A.  Yes.  Q.  And during that time you never made any arrangement about anyone to purchase the wool yourself, did you, or any officer of the bank?  A.  I don't know what the bank done.  Q.  Did you ever hear of their making any arrangement to have the wool clipped and

sell it? A. No. Q. Did you ever hear of any arrangement by anyone, except J. P. Wrathall, to clip the wool and sell it? A. I don't remember ever having heard anything about it up until then. Q. You understood, I gather from this correspondence, that when he sold the wool he would remit the proceeds to you? A. I was advising him in the letter that if he did sell the wool the money must come in to be applied on the mortgage. Q. That is, if Wrathall sold it? A. Yes.''

Mr. Hovey, the officer of plaintiff bank who had made the purchase of the Wrathall notes for the bank, testified: ''Q. Did you understand that the season at which wool is clipped and sold, did you know the season in that country? A. Yes, sir, in a general way I did. Q. You are familiar with the fact that wool was universally clipped and sold during the spring of the year? A. Well, it is pretty late spring in Idaho. Q. What do you mean by late? A. I would say along late in May or June. Q. Well, you had this mortgage on the sheep, I believe, it is dated in March, 1918, and you knew at that time that the wool would, in the ordinary course of events, be clipped and sold, at least in the late spring of that year? A. I knew it was being clipped and would be consigned to some wool house to be handled under Government regulations. Q. You knew it would be disposed of so far as Mr. Wrathall was concerned, did you not? A. I mean that Mr. Wrathall would consign it to some wool house who would handle it for him under Government regulations. Q. And you expected him to deliver the wool to whomever he consigned it to, did you not? A. I expected him to consign it. Q. And that was your understanding and you expected him to deliver you the proceeds? A. I expected him to deliver me the proceeds. Q. During the time from the day of this mortgage of March 26, 1918, up until October or November, 1918, the time you first heard he [Wrathall] had left the country, did you take any steps whatever to have this wool clipped and sold? A. Not to clip it ourselves. Q. You or your bank? A. No, sir. Q. You never made any arrangement whatever to look after it during that time? A. Didn't make any arrangements to clip it. Q. Well, did you make any arrangements to sell after it was clipped? A. No, sir.''

At the close of plaintiff's case in chief, and again at the close of all the evidence, defendant asked the giving of a peremptory instruction in the nature of a demurrer to the evidence. Both such requested peremptory instructions were refused by the trial court. Thereupon, the cause was submitted to the jury under certain instructions severally asked by the respective parties, resulting in a verdict and finding by the jury for the defendant, B. Harris Wool Company.

I.  Our first, or original, opinion herein was grounded upon the legal conclusions, arrived at by the writer of that opinion and concurred in by a majority of this division of this court, (1) that, inasmuch as the evidence shows that the Wrathall mortgage of March 26, 1918, was never filed for record in Minidoka County, where the sheep

**Implied Consent to Sale: Waiver of Lien.** (described therein) were located and kept at the time of the execution of that mortgage, and was not filed for record in Cassia County until after May 6, 1918, the day on which defendant contracted with Wrathall for the consignment of the wool and advanced him $9,000 on the purchase price, therefore defendant's status and rights, as a purchaser or incumbrancer, attached on May 6, 1918, on which date defendant had no constructive notice of the existence or lien of said mortgage and that it was not the duty of defendant to make search for any subsequent filing of a mortgage after it had contracted for the wool; (2) that the testimony of plaintiff's officer, Hovey, clearly manifested the intention of plaintiff to treat the mortgage of March 26, 1918, as an entirely new and original proposition, and to treat the purchase of the new notes, secured thereby, by plaintiff from Stockmen's Securities Company, as an original purchase of the new notes, thereby effecting a full and complete payment, satisfaction and discharge of the earlier Wrathall notes and mortgage of September 28, 1917 (evidencing a loan made by Tagg Bros. & Moorhead), which mortgage was released of record on June 10, 1918, and therefore the status and rights of defendant, as a purchaser or incumbrancer, were unaffected by the original or earlier mortgage of September 28, 1917; and (3) that plaintiff failed to establish by its proof that defendant, or its agents, had actual knowledge or notice of the existence of the mortgages until after the delivery of the wool to defendant, unless Smith, who prepared and took the acknowledgments of the mortgages, and who also prepared the consignment contract, be deemed to have been defendant's agent in preparing the consignment contract, in which event plaintiff failed to sustain the burden of proof that knowledge of the existence of the mortgages was present in Smith's mind at the very time he prepared the consignment contract and the draft for $9,000, constituting the first advance to Wrathall upon the purchase price of the wool.  Hence, we were then of opinion that defendant's demurrer to the evidence should have been sustained, and that the judgment *nisi*, being for the right party, should be affirmed.  It was because of doubt in our minds as to the correctness of our conclusions, or some of them, aforesaid, that a rehearing was granted to plaintiff (appellant).

But, entirely disregarding (on this rehearing) our former opinion and the several grounds, or conclusions, upon which that opinion was predicated, nevertheless we are still of the opinion that de-

fendant's demurrer to the evidence should have been sustained and that, therefore, the judgment *nisi* must be affirmed; for, even though the Wrathall mortgage of March 26, 1918, be ruled to have been filed of record in the proper county before the delivery of the wool to defendant on July 6, 1918, thereby giving notice of the existence of that mortgage and of plaintiff's lien upon the wool in controversy, and, even though the later mortgage be ruled to have been merely a continuation or renewal of the earlier mortgage of September 28, 1917, so that the lien of the earlier mortgage be deemed to have been in full vigor and force on May 6, 1918, when defendant contracted for consignment of the wool, yet we are of the opinion that the evidence conclusively shows that plaintiff impliedly consented to, or acquiesced in, the sale or consignment of the wool by Wrathall, and thereby waived the lien or security of the mortgages, insofar as the wool in controversy is concerned. Hence, we are of the opinion that plaintiff is estopped, by its conduct, to sue defendant for conversion of the wool or the proceeds therefrom.

The evidence shows that, in Idaho, it is the universal custom to clip the wool from sheep in the spring of the year, between April and July, otherwise, it will be lost or wasted by shedding. Both Mr. Tagg and Mr. Hovey, who represented plaintiff in the transaction, admitted by their testimony that they knew this fact, and both testified, in substance and effect, that they expected Wrathall to clip and dispose of the wool and relied upon him to turn over the proceeds to the holder of the mortgage paper. Both witnesses admitted that no arrangements were made, either by plaintiff, the assignee of the mortgage notes, or by Tagg Bros. & Moorhead, or Stockmen's Securities Company, the assignors of the notes, for anyone on their behalf (except Wrathall) to attend to, or look after, the clipping of the wool and its disposition or sale. Plaintiff's officer, Hovey, testified quite positively that he not only knew that the wool was being clipped, or would be clipped, in the late spring of 1918, but that he also knew that it "would be consigned to some wool house to be handled under Government regulations;" that he expected Wrathall to consign the wool and to deliver the proceeds to plaintiff; and that he was familiar, at the time, with the Government regulations, which regulations, it appears, authorized an advance to the wool grower up to seventy-five per cent of the fair estimated market value of his wool. Notwithstanding plaintiff's knowledge of those facts, the evidence is conclusive and uncontradicted that plaintiff failed to look after its mortgage security, allowing Wrathall to clip the wool, to sell or consign it after it was clipped, and to receive advances thereon in accordance with the Government regulations, without attempting to ascertain to whom he was selling or consigning the wool and without either seeing that the advances were applied by Wrathall upon the

mortgage debt or demanding that the advances be turned over directly to plaintiff to be applied upon Wrathall's debt.

By the weight of judicial authority, and upon the facts in evidence, we think plaintiff must be held to have waived the lien and security of its mortgage.

The rule is thus stated in 11 Corpus Juris, 674: "A chattel mortgagee may waive his mortgage lien, or be estopped to enforce it, by conduct inconsistent with its existence, and such waiver or estoppel need not, of course, be shown by written evidence, nor be supported by a consideration."

In Ramsey v. California Packing Corporation, 51 Cal. App. 517, 201 Pac. 481, a case strikingly similar in its evidentiary facts to the case at bar, plaintiff Ramsey and one Emerson were the holders of certain notes given by defendants, Kim and Hahn, secured by chattel mortgage on all crops of sugar beets, corn, tomatoes, and other similar products, being, standing and growing on the land described in the mortgage. At the close of the harvest season of 1918, defendant Packing Corporation purchased and received possession from said mortgagors (Kim and Hahn) of all the crops of corn and tomatoes grown on said land. Shortly after such sale and delivery of the crops, the plaintiff demanded the crops from the purchaser, or enough of the proceeds thereof to satisfy the mortgage claim, and upon the refusal of the purchaser, plaintiff sued defendant purchaser for the alleged wrongful conversion of the crops. In sustaining the granting of a nonsuit upon defendant's motion, the court said: "It is very plain that the nonsuit was properly granted for the reason that the evidence clearly shows that the understanding between the parties was that Kim and Hahn were to remove and sell the crops and with the proceeds pay their mortgage indebtedness to plaintiff and Emerson. From the testimony of Emerson, . . . it is clear that he knew, before the removal of the crop, that Kim and Hahn intended to remove and sell the same. Emerson admitted that he knew that certain portions of the crop had been removed from the premises and sold, and that the mortgagors intended to remove and sell the remainder. Yet neither the plaintiff nor his partner took any steps to prevent such removal and sale. But there was, evidently, according to Emerson's uncontradicted testimony, no intention on the part of plaintiff and Emerson to object to such removal and sale—that, indeed, the removal and sale of the crops by the mortgagors they sanctioned—for, having been asked by counsel for the Packing Corporation the following question: 'It was your understanding, was it not, throughout this transaction, from Kim, that he should sell the tomatoes?' he replied: 'Yes, sir, and pay the rent to us; that he should have the power to sell them and deliver them to whomsoever he chose.' . . . The plaintiff did not contradict that tes-

timony, nor, as stated, is there any testimony in the record contradictory thereto. Indeed, the plaintiff himself testified: 'I am familiar with farming in this location, and I know when tomatoes generally ripen and are ready for delivery at Manteca (near which place are situated the premises on which the crops involved here were grown); they commence to ripen along in September and October; I knew they were ripening in those months, but I did not know that they had been sold; I did not know what Kim was doing with them, or where they were being delivered; I judged that they were, but I could not have told to whom they were delivered or to whom they were sold.' . . . Even if it had been shown that the mortgagors had wrongfully removed the crops and sold the same to a third party, it would still be necessary, to bind the latter in an action for damages for such wrongful removal or for the conversion of the crops, further to show that such removal was tortiously effected with his knowledge or by connivance on his part with those wrongfully removing the crop to effect such removal. There is not only no such showing here, but, to the contrary, as has been stated, even without regard to the positive testimony that Kim was authorized by plaintiff and Emerson to remove and sell the crops, the circumstances of the whole transaction as shown by the testimony of both plaintiff and Emerson very clearly strengthen and sustain the presumption that the crops were removed from the premises and sold by Kim under a specific understanding and agreement with the plaintiff and Emerson that he was thus to dispose of the crops upon their maturity. This agreement (allowing the mortgagors to sell the mortgaged crops and turn over the proceeds of sale to plaintiff and Emerson) amounted in practical effect to a substitution of the personal obligation of the mortgagors for the security of the mortgage. [Minneapolis Thresh. Machine Co. v. Calhoun, 37 S. D. 542, 159 N. W. 127.]''

In Gillilan v. Kendall, 26 Neb. 82, 42 N. W. 281, it is said: ''Necessarily, additional labor must be expended on a growing crop to harvest and care for the same. If the mortgagee intrust this labor to the mortgagor, he, to that extent, makes him his employee. If the entire property in the grain had passed to the mortgagee on the execution of the mortgagee, then it would be the business of the mortgagee to gather and care for the crop, and if he failed to do so, it would go to waste. Where, therefore, the mortgagor remains in possession and is permitted to gather the crop, it will be presumed that it was with the consent of the mortgagee. . . . The more salutary rule, no doubt, is to require the mortgagee to look after his security, and if a change is made in its character, to see that his mortgage still imparts notice of his lien on the property, to third parties. If the owner of goods stand by and knowingly permit them to be sold as the property of another, he will be estopped from afterward

asserting title thereto; and this rule would seem applicable to mort-gages of personal property.''

In Peterson v. Elevator Co., 81 N. W. 59, plaintiff sought to re-cover from defendant for the alleged conversion of certain wheat upon which plaintiff had a chattel mortgage. After quoting the tes-timony of plaintiff's witnesses, the court said: ''The testimony we have adverted to comes from the plaintiff's witnesses, and the same is not disputed in any manner. It shows that the mortgagee saw fit to authorize the mortgagor to sell the property covered by the mort-gage at private sale; and this authority was given under such cir-cumstances as would, if acted upon, result, not only in a removal of the property from the premises of the mortgagor, but likewise in mix-ing the same with other grain, in one common mass, thereby render-ing it impossible for the mortgagee thereafter to identify the prop-erty and take possession of it for purposes of foreclosure. These facts, in our judgment, must operate as an implied waiver of the lien of the mortgage. The case falls squarely within the case of New Eng-land Mort. Sec. Co. v. Great Western Elevator Co., 6 N. D. 407, 71 N. W. 130. [See, also, Hogan v. Elevator Co., 66 Minn. 344, 69 N. W. 1; Partridge v. Elevator Co., 78 N. W. 85; Roberts v. Crawford, 54 N. H. 532.]''

Such seems to be the settled rule of law in Idaho, where the wool here in controversy was contracted for by defendant, where delivery was made to defendant, and where the Wrathall mortgages were exe-cuted. In Adamson v. Moyes, 32 Ida. 469, 184 Pac. 849, it is ruled that the purchaser of mortgaged personal property takes the title free from the lien of the mortgage, if the sale was made with the express or implied consent of the mortgagee. In that case, defend-ant Moyes gave a chattel mortgage upon the crop of beets to be grown on certain land during the season of 1915. Moyes sold the beets to a sugar corporation. Before the beets were dug, the mort-gagee wrote the sugar corporation: ''Mr. Moyes, of Murtaugh, Ida-ho, has my farm rented, and when the beets are harvested, and you get ready to settle, please notify me at Twin Falls, for I have a mortgage on his crop, and it might save trouble in settling up with him if the check is made out to me.'' While the beets were being delivered, the mortgagee's attorney again notified the sugar company of the mortgage, and the company replied in writing that the check in payment of the beets would be held subject to the mortgagee's order. After the delivery of the beets to the sugar company, a garnishment was served upon the company in favor of a creditor of the mortgagor, resulting in a judgment against the sugar company, as garnishee, for a sum equal to the purchase price of the beets. Thereupon the mortgagee sought to hold the sugar company for wrongful conversion of the beets. Said the court: ''A necessary

element of the right to recover upon respondent's (mortgagee's) cause of action, as alleged in his cross-complaint, is that the mortgaged property was taken without his consent. The evidence in the case, however, shows conclusively that the beets were purchased by appellant with the consent of respondent. Respondent argues that he could waive the tort and sue upon an implied promise to pay as upon conversion of the property, but in order to sustain that theory he must allege and prove a wrongful conversion by appellant.''

So, in Bellevue State Bank v. National Bank, 37 Ida. 121, 215 Pac. 126, an action for the alleged conversion of certain cattle, it is said: ''By consenting to the sale respondent waived its mortgage lien on the cattle. Having consented to the sale, the mere fact that it had had a mortgage on the cattle did not necessarily imply ownership, part interest in, or a lien upon, the proceeds. [Durkee v. National Bank, 102 Fed. 845; Fairweather v. Nelson, 76 Minn. 510; Maier v. Freeman, 112 Cal. 8; Carr v. Brawley, 34 Okla. 500; Waters v. Bank, 65 Iowa, 234.]''

To like effect is Peoples v. Whitworth (Ida.), 238 Pac. 306, wherein it is said: ''Appellant alleged that defendants George A. Whitworth and George D. Whitworth, 'without right and in violation of the terms' of the mortgage, sold the cattle, while the evidence all showed, appellant stipulated, and the court found, that the sale was made with the consent of appellant. The sale was not, therefore, wrongful or unlawful, or in violation of the terms of the mortgage, for appellant's consent to the sale had the effect of waiving the lien of the mortgage as to this property.''

Such seems to be the established law of our own State. In Coffman v. Walton, 50 Mo. App. 404, the late Judge ELLISON, speaking for the Kansas City Court of Appeals, said: ''One Darr gave to plaintiff a chattel mortgage on some cattle to secure a note of $730, Darr remaining in possession. Darr afterwards sold the cattle to defendant, and plaintiff instituted this action of replevin and depends upon his mortgage to sustain him. Defendant bought the cattle without actual knowledge of the mortgage; it was, however, duly recorded. Defendant's defense is that plaintiff authorized Darr, generally, to sell the cattle, and that after the sale was made to defendant he assented thereto, and the court so found. The point is made that the evidence in the cause did not justify this finding. After going over the evidence, we discover the finding is supported, and we will not disturb the resulting judgment rendered by the circuit court, if such result is justified by the law. We believe it is so justified. And it makes no difference whether the purchaser knew of the mortgage or not. [Pratt v. Maynard, 116 Mass. 388; Stafford v. Whitcomb, 8 Allen, 518; Jones on Chattel Mortgages, sec. 456.]'' To like effect

are the rulings of this court in Holloway v. Arnold, 92 Mo. 293, and National Bank of Commerce v. Morris, 125 Mo. 343.

The testimony of plaintiff's witnesses clearly shows that plaintiff intended and expected Wrathall to clip the wool and to consign it to a licensed dealer in accordance with the Government regulations then in effect. It follows, we think, that plaintiff bank, by reason of its conduct in permitting Wrathall to clip and consign the wool, and to receive advances thereon, without itself having made any arrangements whatever for the clipping and disposition of the wool, or taking any steps toward seeing that Wrathall applied the proceeds to the mortgage indebtedness, impliedly consented to the sale or consignment of the wool and acquiesced therein. Such conduct on the part of plaintiff amounted to, and operated as, a waiver of its mortgage lien upon the wool, and plaintiff is estopped from maintaining an action for conversion of the wool or the proceeds therefrom. In our judgment, defendant was entitled to a directed verdict under the law and the evidence.

II. It is urged, however, by plaintiff that, assuming that plaintiff had impliedly, or even expressly, consented that Wrathall might sell or consign the wool and apply the proceeds upon the mortgage debt, nevertheless the evidence shows that defendant did not purchase the wool, but merely received it from Wrathall on consignment for sale for his account, and, therefore, plaintiff had **Factor: Consignment for Sale.** the right to withdraw its consent to a sale or consignment of the wool at any time before a sale was made for Wrathall by defendant, which plaintiff did by asserting its rights under the mortgage, demanding possession of the wool, and bringing suit in replevin therefor, all of which steps were taken by plaintiff in October or November, 1918, before the actual sale of the wool to the Government was effected in the latter part of December, 1918. In other words, plaintiff contends that defendant cannot claim the status of an innocent purchaser or incumbrancer, but that defendant was merely a factor or commission agent of Wrathall, and therefore stands in the shoes of Wrathall, its principal, with no better title to, or interest in, the wool than Wrathall had.

The ultimate question presented to us by the foregoing contentions of plaintiff is: Was the defendant a purchaser or incumbrancer? In our former opinion herein we answered that question in the affirmative. Further investigation and study of the facts and the established law strengthens our former conclusion in the matter. The United States Government did not absolutely "take over" the wool clip of 1918, but, by virtue of the promulgated regulations in evidence, merely reserved to itself "a prior right to acquire all of the 1918 wool clip, or any portion thereof which it may require, at the

prices fixed by the War Industries Board," with the further right to allocate for civilian purposes, under the direction of the War Industries Board, such portion of the 1918 wool clip as it did not require for its own use. In order to accomplish such ends and purposes, the Government required that all of the 1918 wool clip be handled and distributed through certain approved dealers, limited in number and licensed by the Government, and then prescribed such regulations for the handling and distribution of the wool clip that the title of the grower would be ultimately transferred to either the Government itself or to some civilian to whom the Government might allocate the wool. The grower was entitled to receive from the licensed dealer an advance up to seventy-five per cent of the fair estimated market value of his wool, and the regulations further obligated the licensed dealer to pay to the grower the remainder of the purchase price as soon as the price was fixed by the Government valuation committee, the grower being "entitled to payment on a basis of the date of the arrival of the wool as shown by the railroad receipt." The regulations specifically prescribed that "the grower does not pay the commission or compensation for handling wools in the designated distributing centers," but "this commission or compensation for handling will be added to selling prices of the wool and paid by the buyer."

To our minds, in the light of the prescribed and compulsory Government regulations, the transaction between the wool grower, Wrathall, and the licensed dealer, such as defendant was, partakes more of the nature of a sale to the licensed dealer than that of a mere factorship or agency. In other words, we think that defendant was a purchaser, or at least a purchaser *pro tanto*, rather than a mere factor. But, as we stated in our former opinion, we do not deem it material herein whether defendant acquired the general property in the wool as purchaser, or whether defendant was merely a factor to whom the wool was consigned to be sold on commission, as plaintiff contends. If merely a factor, defendant nevertheless was a lienor or incumbrancer (in other words, a purchaser *pro tanto*) to the extent of the advances and other charges made by it, and, under the authorities, defendant acquired a special property in the wool to the extent of such advances and charges. [United States v. Villalonga, 23 Wall. (U. S.) 35; Plattner Implement Co. v. Harvester Co., 133 Fed. 376; Haebler v. Luttgen, 61 Minn. 315; Edgerton v. Michels, 66 Wis. 124.] Defendant having acquired a special property in the wool, and being a purchaser *pro tanto*, or incumbrancer, to the extent of the advances made to Wrathall prior to and at the time of the delivery of the wool, plaintiff, in our opinion, could not withdraw its implied consent that Wrathall might sell or consign the wool after the rights and status of defendant, as such purchaser or incumbrancer, had attached and become fixed.

III.   Lastly, plaintiff contends that, at least, it is entitled to recover in the instant action the balance, or surplus, of the proceeds of the sale of the wool, $2615.77, with interest, which sum was in **Unpaid Balance.** defendant's hands at the time of the commencement of the action, and that, therefore, defendant was not entitled to a directed verdict herein. We are of the opinion that plaintiff's contention is not well taken, for several obvious reasons.

In the first place, plaintiff, by its petition, charges defendant with conversion of the *wool* to defendant's own use, and seeks to recover damages by reason thereof in the sum of $37,000. It is clearly evident, from an examination of the pleadings, that plaintiff has not sued upon the theory that defendant has converted the balance of the proceeds; on the contrary, it is evident that plaintiff's action is one at law for the conversion of the *wool*, not the surplus proceeds, and the cause was tried below upon that theory. It follows, we think, that plaintiff must recover, if at all, on the cause of action alleged in its petition, which, as we have stated, is an action at law for conversion of the wool itself. [Moss v. Fitch, 212 Mo. 484, 503; Jennings v. Cherry, 301 Mo. 321, 332.] In the second place, we think that plaintiff has failed to prove a conversion of the surplus proceeds, for the evidence tends to show that defendant has never at any time refused to pay over the balance of the proceeds to the party lawfully entitled thereto, but, on the contrary, has expressed a willingness to hold such balance for the use of such party. Apparently, defendant is disclaiming any title or interest in the surplus, has kept it intact, with the accumulated interest, and stands ready to pay the same into court, or to the proper party, when an appropriate proceeding is brought toward that end, wherein the rights and claims of plaintiff and Wrathall, respectively, to the surplus can be adjudicated and defendant will be protected against the risk of turning over the surplus to the wrong party. In the last place, as we have stated in paragraph I hereof, plaintiff, by reason of its conduct, amounting to an implied consent to the sale or consignment of the wool, has waived its mortgage lien as respects the wool, and is estopped to sue for the conversion of either the wool or the proceeds.

In view of our conclusion that defendant was entitled to a directed verdict *nisi*, it becomes unnecessary for us to consider or pass upon the alleged errors assigned by appellant respecting the admission and exclusion of certain evidence and the giving and refusal of certain instructions.

We think the judgment *nisi* was for the right party and should therefore be affirmed, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.